**Frank E. COTA, Petitioner-Appellant,**

v.

**Frank A. EYMAN, Warden, Arizona State Prison, Respondent-Appellee.**

No. 25231.

United States Court of Appeals, Ninth Circuit.

Dec. 23, 1971.

Rehearing Denied Jan. 17, 1972.

**692**

Browning, Circuit Judge, dissented and filed opinion.

Lawrence C. Cantor (argued), Phoenix, Ariz., for petitioner-appellant.

Roderic A. Dietz, Asst. Atty. Gen. (argued), Gary K. Nelson, Atty. Gen. of Ariz., Carl Waag, Thomas M. Tuggle, Asst. Attys. Gen., Phoenix, Ariz., for respondent-appellee.

Before BROWNING and CHOY, Circuit Judges, and Von Der HEYDT, District Judge *.

CHOY, Circuit Judge.

Cota appeals from the denial of a writ of habeas corpus by the District Court. We affirm.

Appellant and an accomplice, Pedro Flores Valenzuela, were charged with the murder of Roy Singh, an undercover agent for the Arizona Narcotics Department. Proceedings in a state court in Arizona resulted in a mistrial. After commencement of the second trial, Valenzuela pled guilty and was sentenced to death. The trial continued as to appellant, who was convicted by the jury and given a death sentence. An appeal to the Arizona Supreme Court resulted in a reversal, whereupon appellant was retried, convicted, and received a life sentence. The Arizona Supreme Court affirmed the conviction. State v. Cota, 102 Ariz. 416, 432 P.2d 428 (1967).

Appellant instituted a petition for a writ of habeas corpus in the District Court alleging that he had been denied his Sixth Amendment right to confront a witness who testified against him, and that certain prosecutorial misconduct amounted to denial of a fair trial and deprivation of due process under the 14th Amendment.

The prosecutor in his opening statement to the jury mentioned Valenzuela eighteen times, linking him with appellant in the killing of Singh, and referred

---

* Honorable James von de Heydt, United States District Judge for the District of Alaska, sitting by designation.

to three conversations between appellant and Valenzuela, one before and two subsequent to the murder of Singh. These conversations were eventually testified to by witnesses Pino and Osorio.[1] Included in these conversations were an admission by appellant to Pino that appellant had done the killing, and a reproach by Valenzuela to appellant: "What are you trying to prove, what a big man you are? Stabbing a guy in the back?"—to which, Pino said, appellant did not reply. Other testimony showed that appellant and Valenzuela had conspired to and did kill Singh because they had discovered Singh was an undercover agent; e. g., Osorio testified:

> "Pedro Valenzuela asked Frank, he asked him . . . he asked: 'Do you think that they know anything about us, about taking care of that undercover agent?' And Frank Cota said: 'No, because I think some narcotics agents have seen me today, and if they knew anything about me stabbing a guy and beating him up or anything' . . ."

The prosecutor called Valenzuela from prison, where he was awaiting execution, as a state witness. Voir dire examination of Valenzuela outside the jury's presence revealed that Valenzuela would invoke his right under the Fifth Amendment not to incriminate himself, and would refuse to testify. The prosecutor insisted that Valenzuela exercise the privilege before the jury. This was opposed by appellant's counsel, but allowed by the court. Before the jury, Valenzuela was asked his name, age and length of residence in Arizona, which he answered, and then a series of questions to each of which his refusal to answer was sustained. These questions were whether he knew appellant, his acquaintance with two other key prosecution witnesses, and where he lived at the time of the murder. Valenzuela was then excused. Appellant then moved for a mistrial which was denied.[2] Appellant did not testify. During closing argument to the jury the prosecutor's only comment on the reluctant witness was: ". . . Pedro Valenzuela who refused to testify . . ."[3]

Appellant contends that he was denied due process of law because he was deprived of his right to confront and cross-examine Valenzuela who had taken the Fifth Amendment and because he could not question the prosecutor about

---

1. Osorio, on cross examination by appellant's counsel, acknowledged that he had previously by affidavits admitted to the killing of Singh, but upon redirect examination, Osorio contended that his affidavits relating his implication were coerced because he had been threatened by appellant and others under appellant's direction while incarcerated at the Arizona State Prison. This bore on Osorio's credibility. The jury apparently believed him.

2. In State v. Cota, 102 Ariz. 416, 421, 432 P.2d 428, 433 (1967) the Supreme Court of Arizona said:
   "For the state to have presented its theory without calling Valenzuela would have meant leaving an obvious step out of its argument. Then the defense could have argued that the state's failure to produce the alleged accomplice meant that no corroboration for its theory would have come from such testimony. United States v. Gernie, [252 F.2d 664, 669–670 (2d Cir., 1958)]

   "There could have been no testimony more material to the prosecution of this case than that of Valenzuela. Further, since the privilege against self-incrimination is a personal immunity for the witness and does not disqualify him from being called, we cannot conclude otherwise but that, regardless of its reason to believe that Valenzuela would choose to invoke the privilege against self-incrimination, the state had the right to show that it was presenting all the relevant evidence at its disposal in order to prove its theory of the case."

3. A fuller statement of what the prosecutor said is: "A few minutes later, who comes downstairs, Ladies and Gentlemen, but the defendant, Frank Cota, Pedro Valenzuela who refused to testify, and who else, but the person whose picture you saw and who has been identified as Roy Singh, the undercover state narcotics agent . . . ."

the conversations mentioned in the latter's opening statement to the jury. Appellant also urges that the prior knowledge possessed by the prosecutor that Valenzuela, if called, would invoke the Fifth Amendment, showed bad faith on the part of the prosecutor when he forced the invocation of the privilege before the jury.

■ We find nothing objectionable in the prosecutor's opening statement including mention of Valenzuela's name eighteen times in connection with the murder and referring to conversations between appellant and Valenzuela about the killing. The prosecutor did not represent that Valenzuela would testify to those details, and he made good those portions of his statement by the testimonies of witnesses Pino and Osorio. Although appellant had no right to question the prosecutor on any portion of that opening statement, appellant did confront and cross-examine Pino and Osorio, the sources of those details.

More troubling is the requiring of Valenzuela to take the Fifth with prior knowledge that he would do so. Appellant relies on Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) and Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963) in support of his contention that appellant was denied due process of law.

But, the flagrant impropriety found in *Douglas* is absent here, for there, after the witness had claimed the Fifth, the prosecutor persisted in reading the confession bit by bit pausing to ask the witness after each piece, "Did you make that statement?", compelling repeated reliance on the witness' privilege, and, thus, by indirection getting the confession, otherwise inadmissible, into evidence.

Neither is Pointer v. Texas apposite here. The complaining witness' preliminary hearing testimony had been taken when Pointer had no counsel and Pointer neglected to cross-examine. The complaining witness having moved to another state during trial, the prosecutor read that testimony to the jury. The Supreme Court reversed Pointer's conviction holding that the reading of such testimony was a denial of his Sixth Amendment right to confront the complaining witness.

Nor is Namet v. United States of assistance to appellant. There the Supreme Court held that since co-defendant Kahn's spouse had pleaded guilty to wagering, testimony from Mr. Kahn that he had accepted wagers was not privileged; that although the prosecutor required the Kahns to claim their privilege before the jury after their lawyer had announced that they would invoke the privilege, "the prosecutor need not accept at face value every asserted claim of privilege"; that since the few questions to which the claim of privilege was sustained were not the only or chief source of the inference that the witness had engaged in the crime charged with the defendant, no "critical weight" was added to the prosecution's case in a form not subject to cross-examination to defendant's unfair prejudice; and that since the defendant did not ask for curative instructions, the court had no obligation *sua sponte* to give them.

In Cain v. Cupp, 442 F.2d 356 (9th Cir., 1971) where a prosecutor who had been notified that a prospective witness would take the Fifth Amendment, nevertheless called the witness to testify, but promptly excused him when he invoked the privilege, and commented at length on and asked the jury to draw unfavorable inferences from the exercise of the privilege, we held:

> "Although calling the witness may not in itself be sufficient to justify habeas corpus relief, when coupled with the prosecutor's closing argument, it will justify such relief." 442 F.2d at 358.

■ In the instant case, although the prosecutor did call Valenzuela knowing

he would assert the privilege,[4] the only comment thereon in summation was a terse, "Pedro Valenzuela who refused to testify," with no solicitation that the jury draw any inference against appellant.

There was no curative or neutralizing instruction that no inference should be drawn from the failure to testify, but appellant asked for none, perhaps for tactical reasons.[5]

On a consideration of the entire record, we find that the state court committed no constitutional error in that no "critical weight" was added, by the summoning of Valenzuela, to the prosecution's case in a form not subject to cross-examination. The testimonies of Pino and Osorio which covered appellant's admission and his conspiracy with Valenzuela were other sources of the inference created by Valenzuela's refusal to testify that he had had a part in the crime with appellant.

Affirmed.

BROWNING, Circuit Judge (dissenting):

The majority relies principally on the conclusion that the inference drawn from Valenzuela's refusal to testify did not add "critical weight"[1] to the prosecution's case because the facts the jury might have inferred from Valenzuela's claim of privilege were testified to directly by the witnesses Osorio and Pino.

It is respectfully submitted that the majority's premise is faulty.

The prosecution's theory was that petitioner and Valenzuela took the decedent to an abandoned adobe hut on the edge of Phoenix and there stabbed him to death, petitioner wielding the knife.

The prosecution offered Osorio and Pino as witnesses. They testified that before the killing petitioner told Valenzuela he and Valenzuela would have to dispose of the victim; that petitioner and Valenzuela left with the victim, and were later seen without him; and that in subsequent conversations between petitioner and Valenzuela, petitioner admitted the killing.

Despite this testimony, the state's case against petitioner was vulnerable, for the credibility of Osorio and Pino had been seriously undermined. Both were members of the group of narcotics users, including petitioner and Valenzuela, that the victim sought to infiltrate. Both were admittedly with petitioner and Valenzuela before and after the killing. Osorio had a criminal record. At one point he had himself confessed to the killing with which petitioner was charged. Osorio admitted that the deputy county attorney had promised that he would not go to prison if he would testify against petitioner and Valenzuela.[2] Pino had been twice charged with narcotics offenses. He testified, however, that he had "made a deal" that resulted in those charges being dismissed in return for his testimony.

With the trial in this posture, the state insisted that it had the "right" to

---

4. In Frazier v. Cupp, 394 U.S. 731, 736, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969) the Supreme Court indicated, ". . . we do not believe that the prosecutor's good faith, or lack of it, is controlling in determining whether a defendant has been deprived of the right of confrontation . . . "

5. See Bowles v. United States, 439 F.2d 536, 542 (D.C.Cir., 1970).

1. The "critical weight" theory is explained in Namet v. United States, 373 U.S. 179, 187, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963):
   "[This] theory seems to rest upon the conclusion that, in the circumstanc-

es of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. This theory seems also to have been present to some extent in the Maloney [United States v. Maloney] decision, where the court noted that the challenged inferences were the only corroboration for dubious and interested testimony by the Government's chief witness. [2 Cir.] 262 F.2d [535], at 536–537."

2. Osorio was paroled within two months after petitioner's conviction.

call Valenzuela, put him on the stand, and require him to refuse to testify before the jury, although, as the majority states, the prosecutor knew that Valenzuela "would assert the privilege."[3] Petitioner's counsel objected on the ground that since it was clear that Valenzuela would not testify, his appearance before the jury could produce no probative evidence, but only serve to prejudice petitioner because of the improper inference the jury would draw.[4] Although obviously concerned, and after warning the prosecutor that he might be risking reversal, the state trial judge concluded that he had "no jurisdiction or authority to tell the State who to call or when to call," and therefore felt compelled to accede to the prosecutor's demand.

The state's insistence upon calling Valenzuela in the face of the strong opposition of defense counsel and the evident reluctance of the trial judge belies the state's present position that calling Valenzuela was an empty ritual. To the contrary, the state's trial attorney considered the exercise of the state's "right" to require Valenzuela to claim the privilege before the jury vitally important to the state's case. The reason is clear enough.

The jury was unlikely to credit such interested and dubious witnesses as Osorio and Pino. Yet the state's case rested entirely on their testimony. If Valenzuela remained silent on the ground that his testimony would incriminate him, the jury would inevitably infer that had he testified he would have admitted

the acts and statements, damning equally to petitioner, that Osorio and Pino had described. The inference the jury would inevitably draw from Valenzuela's refusal to testify would corroborate the testimony of the state's key witnesses and bolster their credibility.

Precisely this situation was presented to the Court of Appeals for the Second Circuit in United States v. Maloney, 262 F.2d 535, 537 (2d Cir. 1959). Maloney and others were charged with offenses arising out of a scheme to blackmail. An accomplice, Parker, "appeared as a witness for the prosecution and his testimony was its main reliance." He described in detail the activities of the defendants and others in the scheme. The state then called three unindicted participants in the scheme, and asked them about their participation as testified to by Parker. Each declined to answer on grounds of possible self-incrimination.

In reversing, Judge Learned Hand pointed out, "The jury was unlikely to accept Parker's testimony unless it was corroborated" (536), and continued (537):

"When a witness claims his privilege, a natural, indeed an almost inevitable, inference arises as to what would have been his answer if he had not refused. If the prosecution knows when it puts the question that he will claim the privilege, it is charged with notice of the probable effect of his refusal upon the jury's mind. In the case at bar it can hardly be doubted

---

3. In a hearing out of the jury's presence, Valenzuela's counsel informed the court that if required to take the stand Valenzuela would claim his Fifth Amendment privilege and refuse to answer any questions. The court had Valenzuela sworn and questioned out of the jury's presence, and Valenzuela asserted the privilege. Nonetheless, at the prosecutor's insistence the performance was repeated before the jury moments later.

4. The state argued that, if it failed to call Valenzuela, it would leave itself open to the "missing witness" plea: since the jury had a "reasonable idea" that Valenzuela was in custody, if he were not

called the jury would infer that it was because he would not corroborate the state's theory.

Petitioner's counsel correctly pointed out that the court could avoid prejudice to the government by admonishing defendant not to suggest to the jury that any inference unfavorable to the prosecution could be drawn from failure of the witness to appear. If counsel made any such suggestion, the prosecution would then be free to disclose the reason for the witness's absence. United States v. Roselli, 432 F.2d 879, 904 (9th Cir. 1970); United States v. Maloney, 262 F.2d 535, 537 (2d Cir. 1959).

that the answers of each of the three witnesses, if given, would have served to corroborate Parker's story, . . . . Such refusals have been uniformly held not to be a permissible basis for inferring what would have been the answer, although logically they are very persuasive. . . . [I]t is clear, not only that the presumed answer has not the sanction of an oath, but—what is even more important—that the accused cannot cross-examine." [5]

It turns things upside down to say, as the majority does, that the inference that Valenzuela participated in the crime with petitioner was rendered harmless by Osorio and Pino's direct testimony to those facts. The point, to repeat, is that the testimony of Osorio and Pino was rendered credible by the improper but inevitable inference the jury was permitted to draw from Valenzuela's silence.

It is no answer to say, as the majority does, that the prosecutor's closing comment upon Valenzuela's silence was brief and the jury was not solicited to draw inferences against petitioner. There was no need to emphasize the obvious. Petitioner's counsel accurately describes the impact of the incident in the context of the trial when he states that though Valenzuela's "only testimony before the jury consisted of his name, age and domicile," he was "the star witness against" petitioner. The episode constituted more than a "minor lapse" in the context of the entire proceeding. *See* Douglas v. Alabama, 380 U.S. 415, 420, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); United States v. Hiss, 185 F.2d 822, 832 (2d Cir. 1950). For the reasons suggested earlier, it was the crux of the state's case.

It is inaccurate to say, as the majority does, that petitioner did not ask for a curative instruction. When Valenzuela was called before the jury and refused to testify, petitioner's counsel objected, moved for a mistrial, and asked that "the jury be instructed . . . to disregard this testimony." When the prosecutor commented upon Valenzuela's

---

5. As the majority implies, the Confrontation Clause of the Sixth Amendment, made applicable to the states by the Fourteenth, Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), forbids use of inferences from the claim of privilege that add critical weight to the prosecution's case in a form not subject to cross-examination. Douglas v. Alabama, 380 U.S. 415, 420, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

This is true whether the prosecution or the defense seeks to rely upon such inferences. *See* United States v. Beye, 445 F.2d 1037, 1038 (9th Cir. 1971), following the decision in Bowles v. United States, 439 F.2d 536 (D.C.Cir.1970). The rule and its reasons are stated in *Bowles, id.,* at 541–542:

"It is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense. The rule is grounded not only in the constitutional notion that guilt may not be inferred from the exercise of the Fifth Amendment privilege but also in the danger that a witness's invoking the Fifth Amendment in the presence of the jury will have a disproportionate impact on their deliberations. The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination.

An obvious corollary to these precepts is the rule that a witness should not be put on the stand for the purpose of having him exercise his privilege before the jury. This would only invite the jury to make an improper inference. For the same reason no valid purpose can be served by informing the jury that a witness has chosen to exercise his constitutional privilege. That fact is not one the jury is entitled to rely on in reaching its verdict.

The other side of the coin, however, is the rule that the jury is not entitled to draw any inference from a failure to testify that is ascribable to the witness's reliance on his Fifth Amendment privilege" (citations omitted).

silence in closing argument, petitioner's counsel again objected, moved for mistrial, and asked "that the prosecutor's remarks be stricken."

Thus on both occasions counsel asked the court to address the jury with respect to the prosecutor's reliance upon the witness's silence. In his argument in support of these requests, petitioner's counsel fully advised the court that his basic objection was that the jury would draw inferences adverse to petitioner from the witness's refusal to testify. On this record it is an excess of technicality to hold that counsel failed in his obvious purpose to obtain a "curative or neutralizing instruction" simply because he did not use those magic words.

The suggestion that petitioner may have had tactical reasons for failing to request such an instruction is insupportable. He asked for such an instruction in substance, if not in form. Even if he had not made his wishes so clear, no reason can be suggested why he would not want the instruction. Obviously the motivation referred to in Bowles v. United States, 439 F.2d 536, 542 n. 6 (D.C. Cir. 1970), was not present in this case.[6]

Finally, this case contains none of those factors, noted in *Maloney, supra,* 262 F.2d at 538, that have led courts to affirm convictions in spite of the fact that the prosecutor knew a witness would refuse to testify if called.

Valenzuela clearly had the right to invoke the privilege since he was appealing his murder conviction at the time in question. He had not "lost any privilege he might have had." *Maloney, id.*; see United States v. Gernie, 252 F.2d 664, 669–670 (2d Cir. 1958).

Petitioner objected strenuously to the testimony of Valenzuela. He did not allow "the examination to go on so long without protest that he had lost any right to raise the question." *Maloney,* 262 F.2d at 538; see United States v. 5 Cases, etc., 179 F.2d 519, 523 (1950).

The writ should issue.

6. In *Bowles* the government's theory was that the defendant alone committed the crime. The defense was that the crime had been committed by another person. The trial court declined to call this person as a defense witness upon being advised that he would claim his Fifth Amendment privilege. The question was whether the trial court should have given an instruction that no inference was to be drawn from the witness's absence. Defendant had not requested such an instruction. As the appellate court pointed out, defendant's counsel may have reasoned that without an admonitory instruction the jury would not blame the defendant for the witness's absence since defendant could not be expected to produce a witness who would testify that he and not the defendant committed the crime. On the other hand, the jury might well wonder why the government did not produce the witness since, on the government's theory the witness if called would only have had to deny that he committed the crime. Thus from the defendant's viewpoint, "The possibility for arousal of a reasonable doubt in the minds of the jurors would have been removed by a neutralizing instruction from the court."

In the present case the government's theory was that *both* petitioner and the witness committed the crime; and the defense did not seek to exculpate petitioner at the expense of Valenzuela. *See also* note 4, *supra.*