573 P.2d 864

**STATE of Arizona, Appellee,**

v.

**Russell Lee CALDWELL, Appellant.**

**No. 3744.**

Supreme Court of Arizona,
In Banc.

Dec. 21, 1977.

Bruce E. Babbitt, Atty. Gen., William J. Schafer, III, Chief Counsel, Criminal Division, Georgia B. Ellexson, Asst. Atty. Gen., Phoenix, for appellee.

Westover, Choules, Shadle & Bowen, P. C. by Allen J. Clark, Yuma, for appellant.

GORDON, Justice:

On the evening of July 15, 1976, Harry Seth and Robert Guy arrived at a house occupied by Tucker to purchase some marijuana from three of Tucker's friends, Lester Fenderson, Lex Allen and the appellant. Seth and Guy entered the house at differ-

ent times where, pursuant to a prearranged plan, they were bound and robbed by Tucker's friends.[1] While there is no evidence that Caldwell did the shooting himself, Guy was murdered later that same evening.

The major pieces of evidence linking appellant to the robbery were testimony by Fenderson that appellant had been a participant and Seth's identification of appellant as one of his assailants.

The appellant was tried and convicted of two counts of robbery, two counts of kidnapping and one count of first degree murder under the felony murder rule. We have jurisdiction of his appeal pursuant to A.R.S. § 13–1711. Additional facts necessary for the resolution of the case will be developed as each issue is discussed.

At one point during the presentation of the state's case to the grand jury, one of the grand jurors, Mrs. Schell, stated, "I don't like this case. I had a son killed and I don't like it." In response to this unsolicited comment, the prosecutor questioned the juror about her feelings, suggesting that she withdraw from consideration of the case if her past experience would influence her vote. The juror stated that it would not. At this point, the grand jury foreman stated "When Rick is talking to the people on the other side of the room, would he please speak up because we cannot hear what he is saying to them over there." After this statement by the foreman, the prosecutor asked the grand juror to repeat what she had told him in order to clear up the possibility that some grand jury members had not heard their dialogue.

■ After the indictment was returned, the appellant filed a motion for a new finding of probable cause pursuant to Rule 12.9,

Arizona Rules of Criminal Procedure. The motion was denied. His first contention on appeal is that the request by the foreman indicates that certain members of the grand jury were unable to hear portions of the evidence presented at the proceedings. Considering the context in which the foreman's question was asked, we are satisfied that the only discussion certain jurors were unable to hear was the above mentioned dialogue between the prosecutor and Mrs. Schell. Since no part of that dialogue constituted testimony offered in support of a determination of probable cause, it is irrelevant that some members of the grand jury did not hear it.

■ Rule 12.2 of the Arizona Rules of Criminal Procedure provides that grand jurors who are biased in favor of the state shall be disqualified. The appellant's next contention is that the grand juror's statements about "not liking the case" indicate that she was biased in favor of the state. Proof that a juror harbors strong feelings about a case or type of crime does not, without more, demonstrate that the juror is biased. *State v. Salazar*, 27 Ariz.App. 620, 557 P.2d 552 (1976). Furthermore, as in *Salazar*, the juror in this case stated that her feelings would not influence her consideration of the evidence. We find that the trial judge did not abuse his discretion in determining that Mrs. Schell was not biased in favor of the state.[2]

■ Appellant further contends that the dialogue between the prosecutor and the grand juror constituted "prejudicial" conduct creating such an "emotional atmosphere" that the grand jury was not able to decide the case "free from sway" within the

---

1. Although Tucker had planned the robbery he did not participate in its perpetration.

2. In *Salazar*, the possibility of bias on the part of the grand jurors came to the attention of the court during the impaneling of the jurors. Hence, the judge had an opportunity to pass on the juror's fitness and substitute another juror prior to the presentation of cases by the county attorney. In the case at hand, the alleged bias surfaced after impanelment while the grand jury was hearing a case, and, hence, did not

come to the judge's attention until after the indictment had been returned.

Of course, the trial judge was still required to determine whether Mrs. Schell was biased in favor of the state even though he would have had no opportunity to substitute another juror had he found that she was. Since no grounds for disqualifying Mrs. Schell existed in this case, we need not discuss the consequences of a finding, after a case is heard, that the juror was biased.

rule of *State v. Good*, 10 Ariz.App. 556, 460 P.2d 662 (1969). We cannot agree. The county attorney acted properly when he attempted to determine whether the grand juror could deliberate the case with impartiality after making such a comment. Furthermore, the discussion was a short, isolated incident in these proceedings. It was not calculated by the county attorney to improperly influence the jury's actions. *Id.* We find that the grand jury acted with impartiality. Since appellant was not denied any substantial procedural right during the grand jury proceedings, the trial judge did not err in denying the motion for a new finding of probable cause. (See *State v. Hocker*, 113 Ariz. 450, 556 P.2d 784 (1976)).

The appellant alleges that he was denied his right to an impartial jury because up to twenty-four members of the panel from which the jury was selected had been prospective jurors in one or more cases of appellant's codefendants.

The record on appeal does not include the proceedings relating to the impaneling of the jury or the voir dire examination of the prospective jurors. The record before us does indicate, however, that the trial judge conducted voir dire examination of each prospective juror, that counsel for each side was permitted to examine the jurors on any response made to a question asked by the judge, and that the judge made a determination that the panel was not "contaminated" after considering appellant's allegation.

■ Because of the state of the record, we cannot make an independent determination of how many members of the panel actually had been prospective jurors in other cases. Neither can we determine whether the trial judge's questions and the prospective jurors' responses actually demonstrated the jurors' impartiality. In such cases, we have stated, "it is the duty of counsel who raises objections on appeal to see that the record before us contains the material to which he takes exception * *. (Citations omitted.) Where matters are not included in the record on appeal, the missing portions of the record will be presumed

to support the action of the trial court. (Citations omitted.)" *State v. Bojorquez*, 111 Ariz. 549, 553, 535 P.2d 6, 10 (1975). We find that the trial judge did not abuse his discretion in determining that the jury or any of its members could decide the case without bias or partiality. *State v. Narten*, 99 Ariz. 116, 407 P.2d 81 (1965), cert. denied 384 U.S. 1008, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966).

■ The appellant alleges that the trial judge erroneously denied his motion for a change of venue under Rule 10.3(b) of the Rules of Criminal Procedure. The evening before the jury selection process was begun, The Yuma Daily Sun printed a brief article stating that final arguments had been made that morning in the trial of one of appellant's codefendants. The article also indicated that two other codefendants had already been convicted on all charges. Appellant's name was not mentioned in the article. Appellant contends that because there is a substantial likelihood that many of the prospective jurors read the article, a fair trial could not be had in Yuma. In *State v. Richmond*, 112 Ariz. 228, 230, 540 P.2d 700, 702 (1975), we stated, "When, as here, the reason for the motion for a change of venue is pretrial publicity, Rule 10.3(b), Rules of Criminal Procedure 1973, requires a showing that the publicity will probably result in a denial of a fair trial. * * * Defendant was not subject to sensational or inflammatory coverage by the news media. We do not believe from the record in this case that the pretrial publicity was prejudicial. A juror does not have to be completely ignorant of the facts of a particular case before he can sit as a juror." We agree with the trial judge that the newspaper account in this case was "factual and restrained" rather than "sensational or inflammatory", *Id.* and that the story did not operate to deny appellant a fair trial. We find that the court did not abuse its discretion in denying the motion. *State v. Ruffin*, 110 Ariz. 364, 519 P.2d 63 (1974).

■ Appellant objects to the fact that the trial court admitted a photograph of the deceased's body into evidence. The

trial judge has considerable discretion in admitting or excluding photographs of a murder victim. *State v. Thomas*, 110 Ariz. 120, 515 P.2d 865 (1973). So long as the photos have some probative value, they are admissible even though the photographs may be inflammatory or may arouse the emotions of the jury. *State v. Ferrari*, 112 Ariz. 324, 541 P.2d 921 (1975). *State v. Thomas, supra.* Here, as in *Ferrari*, the photograph tended to corroborate the state's theory of how and why the homicide was committed, to illustrate and explain testimony and to prove malice aforethought. We find no abuse of discretion.

During the cross examination of Fenderson, one of appellant's codefendants and one of the state's key witnesses, the following exchange took place:

"BY MR. CLARK:

"Q. Mr. Fenderson, the prosecutor had dismissed kidnapping, two counts of kidnapping, two counts of armed robbery and first degree murder against you, has he not?

"A. Yes.

"Q. And your promise to him in exchange for that was that you would testify for the State in the trials of Mr. Fletcher and Mr. Caldwell?

"A. Yes.

    \*    \*    \*    \*    \*    \*

"Q. Now at the time that you made this deal with the State you knew that you might be subject to the gas chamber, didn't you?

"A. Yes.

"Q. Would you lie to keep from going to the gas chamber, Mr. Fenderson?

"MR. DONATO: I'm going to object to the form of those questions.

"THE COURT: Yes, the objection is sustained.

"BY MR. CLARK:

"Q. You lied to the police, did you not, about this incident?

"A. No.

"Q. You never did?

"A. No.

"Q. I thought on your direct examination you stated that you told the police that Mr. Guy was hit in the head by Mr. Caldwell?

"A. Yes.

"Q. That was a lie, wasn't it?

"A. I didn't tell the police that?

"Q. You didn't tell the police that?

"A. No, I didn't. I only made one statement and that was to Captain Crow. I didn't say nothing about the robbery.

"Q. Did you tell the prosecutor that it was Caldwell?

"A. Yes, I did.

"Q. So you lied to the prosecutor?

"A. Yes.

"Q. What did you tell Captain Crow?

"A. I told Captain Crow the events of the day except for I left out the robbery.

"Q. I see. And it's your testimony that you wouldn't lie to keep from going to the gas chamber?

"MR. DONATO: Object to the form of the question again, Your Honor.

"THE COURT: Yes, the objection is sustained."

Appellant contends that it was error for the court to sustain objections to the above questions of defense counsel. We find nothing wrong with the form of the first question. However, since Fenderson later admitted that he had, in fact, lied to the prosecutor on a matter connected with the trial, the error in excluding the original question was harmless. See *Conner v. Brkich*, 14 Ariz.App. 208, 481 P.2d 894 (1971). *In Re Mew Len Ching's Estate*, 46 Haw. 127, 376 P.2d 125 (1962). The second question was properly excluded. Fenderson had not testified that he wouldn't lie in order to be saved from the gas chamber. Hence, the question, as propounded, was argumentative. McCormick on Evidence, § 7 (2d Ed., 1972).

The appellant argues that his right to due process was violated on the grounds that a pretrial lineup at which he was identified by Seth was unduly suggestive. Immediately after the events of July 15, Seth described one of his assailants to the police as

a black man of light complexion with a scar on his face. On July 26 Seth was asked to look at three separate lineups. Each of the first two lineups contained a different codefendant of appellant's.[3] Seth was unable to pick out either codefendant. The appellant appeared in the third lineup with six other black men. While the scar is not visible in the photographs of the lineup, the pictures do indicate that the appellant has a somewhat lighter complexion than any of the others.

While there is no record of the proceedings related to these lineups, the prosecutor admits that immediately after picking appellant out of the third lineup, Seth made the following statement, "You would think I could do better than that".

In support of his theory that the lineup was structured so that it would not be a test of Seth's ability to discriminate, *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), the appellant theorizes that this statement demonstrates that Seth merely chose the only man meeting the prior description he had given the police, and that the statement expresses "the fact that while that must be the man, I really don't recognize him".

We cannot agree with this tortured construction of Seth's statement. Apart from this statement, there is no evidence that Seth's identification of the appellant was uncertain, hesitant, or reluctant. If there had been some such evidence, it could be said that the statement referred to the weak identification. Without a clear referent in the record, though, the statement cannot, by itself, be taken as an indication of uncertainty as to a particular identification.

Considering the circumstances in which the statement was made, it is our opinion that Seth was referring only to his inability to identify anyone in two of the lineups he had just looked at. The statement does not support appellant's allegation that the lineup was unduly suggestive.

In *State v. Money*, 110 Ariz. 18, 514 P.2d 1014 (1973), two people were robbed by three men. Although the descriptions given by the victims varied, all three men were described as being Negro, and one was described as having a mustache. The defendant appeared in a lineup with three other black men. There were minor differences as to height, weight and hair length. The defendant, however, was the only man in the lineup who had a mustache. Before observing the lineup, the victims were not told how many of their assailants the lineup would contain. They did not know whether it would include just one, just two or all of their assailants. Both victims identified the defendant. After stating, "we must look * * * to the 'totality of the circumstances' surrounding the identification procedure to determine whether the lineup was unduly suggestive", *Id.* at 21, 514 P.2d at 1017, we held, "The witnesses were looking for three men, two of whom did not have mustaches and who, according to the witnesses' general descriptions, could have matched the other three men in the lineup. Under the circumstances, the lineup was not unduly suggestive." *Id.* at 23, 514 P.2d at 1019.

The situation in the case at hand is quite similar. Seth was not told prior to observing the lineups how many of his assailants would appear in each lineup. Since Seth did not pick anyone out of the first two lineups, Seth was still looking for any combination of all three of his assailants at the time he identified appellant. Since the other men in the lineup could have matched the general descriptions of the other two defendants, we find that the lineup was not unduly suggestive.

Other than the three codefendants, all the participants in the lineup were Marines who had been transported from San Diego for the purpose of appearing in the above described lineups. Appellant contends that since Seth was also a Marine, there was a "distinct possibility" that he knew many of the participants. Appellate courts will review only those matters which

---

3. One of these defendants, Roy Lee Fletcher was later acquitted.

appear in the records of the trial court. *State v. Wilson,* 95 Ariz. 372, 390 P.2d 903 (1964). Since appellant offers no support for this contention, we cannot consider it.

Appellant's attorney, Allen Clark, alleges that, after identifying Caldwell, Seth not only said, "You would think I could do better than that", but also stated "I should be able to recognize him better than that". He alleges further that he was the only one who heard the statement. During his cross-examination of Seth, Clark asked Seth if he remembered saying immediately after the lineup, "you would think—I should be able to recognize him better than that." Seth stated that he did not remember making that statement. Later in the trial Clark moved that he be permitted to impeach Seth by testifying, himself, that Seth had indeed made the statement. The trial judge denied the motion stating, "I think its very improper, therefore you won't be permitted to take the stand. It creates an intolerable situation in the courtroom for counsel to testify."

As a matter of evidence law, the general rule is that a defense attorney is competent to testify on behalf of his client. *People v. Smith,* 13 Cal.App.3d 897, 91 Cal.Rptr. 786, 52 A.L.R.3d 875 (1970). Nevertheless, because of the ethical improprieties of defense counsel acting as both witness and advocate, courts have historically disapproved of the practice. *People v. Smith, supra; Commonwealth v. Scoleri,* 415 Pa. 218, 202 A.2d 521, petition dismissed, 415 Pa. 252, 203 A.2d 319 (1964). The reasons for this disapproval are well articulated in Ethical Consideration 5–9 of the American Bar Association Code of Professional Responsibility, "* * * If a lawyer is both counsel and witness, he becomes more easily impeacha-

ble for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemingly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively."

■■■ Consistently with DR5–102(A) of the Code of Professional Responsibility,[4] courts normally resolve the tension between the evidentiary rule and the disciplinary rule by permitting counsel to testify only if he completely withdraws from the case. *People v. Smith, supra; State v. Bechtelheimer,* 151 Kan. 582, 100 P.2d 657 (1940); *State v. Brady,* 16 N.C.App. 555, 192 S.E.2d 640 (1972), cert. denied 282 N.C. 582, 193 S.E.2d 745(1973); *Fish v. Commonwealth,* 208 Va. 761, 160 S.E.2d 576 (1968). While in some cases, the problem has arisen in the context of the trial judge's offering counsel the choice of either testifying and withdrawing or not testifying and continuing as advocate, we do not feel that the trial judge is obligated to do so. When defense counsel has reason to believe that he will be called as a witness, the burden is upon him to propose the solution of his withdrawing from the case. Since Mr. Clark did not offer to withdraw from the case, the trial court was correct in ruling that his testifying would be "improper".

We are aware that there are situations where DR5–102(A) does not require that an attorney withdraw from the case as a condition of his testifying.[5] Of course, since the

---

4. DR5–102(A) of the Code of Professional Responsibility states, "If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR5–101(B)(1) through (4).

5. The last part of DR5–102(A) states, "Except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR5–101(B)(1) through (4).

DR5–101(B)(4) states, "As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

ethical impropriety is removed in such cases, it would be improper for the trial judge to refuse an attorney permission to testify. In our opinion, though, this is not one of the cases covered by DR5–101(B)(4). At the latest, Clark was on notice of his ethical duty to withdraw prior to the presentation of the case for the defense. Clark's co-counsel, Mr. Irwin Acker, who sat at the defense table throughout the trial, could easily have taken over the case had Clark withdrawn at that time.

At one point in the proceedings, the state called Arnold Tucker to the stand to corroborate the testimony of Seth and Fenderson. Tucker had just been convicted of all the crimes with which the appellant was charged. After a few preliminary questions, the prosecutor asked Tucker if he was acquainted with the appellant. Tucker refused to answer on Fifth Amendment grounds. The court then informed the defendant that the court had already ruled that he had waived his privilege against self-incrimination and directed the defendant to answer. At this point, the witness stated that he had "other reasons why I don't want to answer other questions". After excusing the jury, the judge interrogated Tucker as to his reasons for refusing to testify. Later, after Tucker had consulted with his attorney, the prosecutor and defense counsel agreed to withdraw Tucker as a witness.

The appellant alleges that the prosecutor knew Tucker would "take the Fifth" before he called Tucker to the stand, and that — forcing Tucker to invoke his Fifth Amendment privilege in front of the jury denied the appellant his right to a fair trial. The appellant's contention is that a refusal by a witness to admit that he knows the defendant on the grounds that it "might incriminate himself" is tantamount to testimony, not subject to cross-examination, that the witness and defendant were involved together in criminal activity.

In *State v. Cota*, 102 Ariz. 416, 432 P.2d 428 (1967), the defendant and Valenzuela were charged with the murder of Roy

Singh. After pleading guilty, Valenzuela was called by the state in its case against Cota. Valenzuela had earlier stated that, if called to testify, he would invoke his Fifth Amendment right not to incriminate himself. The prosecutor nevertheless called Valenzuela to the stand and asked him a series of questions relating to: the events of the evening of the murder, whether he was acquainted with the defendant, and other persons with whom Valenzuela and the defendant allegedly kept company. Valenzuela invoked the Fifth Amendment in response to all these questions. In holding that the prosecutor's act of calling the witness to the stand knowing he would invoke the privilege was not improper we stated:

> "* * * since the privilege against self-incrimination is a personal immunity for the witness and does not disqualify him from being called, we cannot conclude otherwise but that, regardless of its reason to believe that Valenzuela would choose to invoke the privilege against self-incrimination, the state had the right to show that it was presenting all the relevant evidence at its disposal in order to prove its theory of the case." *Id.* at 421, 432 P.2d at 433.

In *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963) the Supreme Court developed a two pronged test for determining whether a witness' claim of privilege after being called to the stand by the prosecutor constitutes reversible error.

> "First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from the use of the testimonial privilege." *Id.* at 186, 83 S.Ct. at 1154.

> "A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form

not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187, 83 S.Ct. at 1155.

Applying these tests to the facts of *State v. Cota, supra*, the Ninth Circuit Court of Appeals denied Cota's writ of habeas corpus in *Cota v. Eyman*, 453 F.2d 691 (9th Cir., 1971). First, the court held that in contrast to a case such as *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965),[6] no flagrant impropriety was demonstrated by the types of questions asked by the prosecutor.

Second, the court held that even though Valenzuela's refusal to testify may have created an inference that he and the defendant were involved together in criminal activity, no "critical weight" was added to the prosecutor's case because the inference was corroborated by the testimony of two other witnesses.

■ Turning to the case at hand, there is, first, no clear evidence that the prosecutor was aware that Tucker would refuse to answer questions. Second, in contrast to *Cota*, where the prosecutor asked a number of questions after the witness invoked his privilege, the prosecutor in this case agreed to withdraw Tucker as a witness immediately after it became apparent that Tucker would refuse to answer certain questions. We find that this conduct does not amount to a "conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege". *Namet v. United States*, 373 U.S. at 186, 83 S.Ct. at 1154.

■ Second, any inference that Tucker was involved with Caldwell in criminal activity that may have arisen from his refusal to testify was corroborated by the testimony of Seth and Fenderson. Hence, as in *Cota v. Eyman, supra*, the inference did not add "critical weight" to the prosecutor's case.

■ The appellant further contends that the trial judge erred in failing to advise the jury to disregard the fact that Tucker invoked the Fifth Amendment. The record does not indicate, however, that defense counsel asked for such an instruction. In fact, the only curative instruction requested by defense counsel was one that would advise the jury that it was not the defendant's responsibility that Tucker refused to testify. The judge agreed to and did advise the jury that Tucker refused to testify despite the request of both counsel that he testify. We find no error. *See Cota v. Eyman, supra.*

■ After Tucker had been withdrawn as a witness, the appellant's attorney offered to prove, through his law clerk that Tucker had stated on an earlier date that "Caldwell had nothing to do with the crimes alleged". An adverse witness may be impeached by a showing that he has previously made statements inconsistent with his present testimony. *State v. White*, 92 Ariz. 306, 376 P.2d 771 (1962). McCormick on Evidence § 34 (2d Ed., 1972). It is our opinion that the preliminary requirement that there be testimony inconsistent with prior statements is not met in this case. Whatever inference may have arisen from Tucker's refusal to testify, such inference cannot, without more, be characterized as testimony subject to impeachment. Furthermore, it is well-established that before a witness may be impeached by a prior inconsistent statement, the proponent of the prior statement must lay a proper foundation. This foundation consists of calling the witness' attention to the prior inconsistent statement so that the witness has an opportunity to explain or deny the statement. *Kerley Chemical Corporation of Arizona v. Producers Cotton Oil Company of Arizona*, 2 Ariz.App. 56, 406 P.2d 258 (1965); McCormick on Evidence § 37 (2d Ed., 1972); Udall, Arizona Law of Evidence (1960) § 63. Since defense counsel failed to ask Tucker a

6. In *Douglas*, the witness claimed his Fifth Amendment privilege. Nevertheless, the prosecutor read a complete confession to the witness, pausing after each segment to ask the witness if he had made that statement. By forcing the witness to invoke the privilege in response to each question, the prosecutor was able, by indirection, to get an otherwise inadmissible confession into evidence.

"warning question", the prior statement he allegedly made is inadmissible. The appellant cannot be heard to complain that he had no opportunity to lay the proper foundation because, as we have stated, he agreed to withdraw Tucker as a witness before exercising his right to cross-examine him.

Finally, appellant alleges that no evidence was offered to prove that the victim's death was the result of the two bullet wounds. The record clearly indicates, however, that the appellant's attorney stipulated that a murder had been committed and that the stipulation was accepted by the court and prosecutor.

We have reviewed the record pursuant to A.R.S. § 13-1715 and find no fundamental error. The judgment of the trial court is affirmed.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HAYS and HOLOHAN, JJ., concur.