669 P.2d 58

**STATE of Arizona, Appellee,**

v.

**Robert Lee HENSLEY, Appellant.**

**No. 5556.**

Supreme Court of Arizona,
En Banc.

June 30, 1983.
Rehearing Denied Sept. 13, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Georgia B. Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

James Hamilton Kemper, Phoenix, for appellant.

FELDMAN, Justice.

Robert Lee Hensley (defendant), Robert Berndt and Richard Cihak were charged by indictment with two counts of first degree

murder, and one count of attempted murder, armed robbery and kidnapping. Prior to trial, defendant requested a voluntariness hearing with respect to several statements he had made to police officers. The trial judge disqualified himself from that hearing and the issues were heard by Judge Scott, who suppressed some of defendant's statements but ruled that two confessions were admissible.

Defendant then waived his right to trial by jury and submitted his case to the trial court for determination of guilt or innocence based on a "packet" of exhibits, including the two statements which Judge Scott had ruled were admissible. After reading the exhibits, which included police reports, summaries of witness interviews, statements and confessions by the codefendants and the two confessions which Judge Scott had ruled admissible, the trial judge found the defendant guilty on all counts except kidnapping. The trial court then held an aggravation-mitigation hearing pursuant to A.R.S. § 13–703(B). At that hearing, the trial judge again considered the packet of exhibits, though the stipulation had stated only that the packet was submitted for determination of guilt or innocence. The trial judge found no mitigating circumstances sufficiently substantial to call for leniency and one aggravating circumstance, that the murder was committed in expectation of pecuniary gain. A.R.S. § 13–703(F)(5). The defendant was sentenced to death for each count of murder and to consecutive terms of 21 years' imprisonment for attempted murder and robbery. Appeal of conviction on sentence of death is automatic. Ariz.R.Crim.P. 31.-2(b). We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. § 13–4031.

Defendant raises several allegations of error on appeal, claiming that all of his statements should have been found inadmissible and that the trial court should not have considered the packet of exhibits at sentencing. The facts necessary for consideration and decision of these issues are as follows.

## FACTS

Defendant was employed by a Minnesota company which specialized in cleaning newspaper press rooms. He was sent to Phoenix to assist in cleaning at the Arizona Republic and Phoenix Gazette. Defendant traveled to Phoenix by bus, and en route met Robert Berndt. Berndt had with him a .357 magnum revolver. When the two men arrived in Phoenix, they were low on funds and sought assistance at the Salvation Army. There they met Richard Cihak and Roger and Joyce Windemuth. The group decided to pool their meager resources and rent a room at a motel on Van Buren Street.

On the evening of January 26, 1981, defendant, Berndt and Cihak left the motel in the Windemuth's car. They cased several grocery stores and then passed the Tin Horn Saloon. The Tin Horn appeared deserted and the men decided it made an attractive target for a robbery. They therefore entered the bar. Defendant was armed with Berndt's gun and ordered the three people in the bar (the female bartender and a male and female customer) to get on the floor. Cihak stood at the door. Berndt took money from the cash register. As the bartender, Mary Turman, and the two customers, Donna Yeager and Bill Cooper, lay face down on the floor, defendant fired four to five shots, striking each victim at least once in the head. Cooper was dead at the scene; Turman died at the hospital and Yeager miraculously survived.

The three men then returned to the motel and drank until all fell asleep. The next day, defendant shot Cihak in the chest with the .357 revolver and then simply walked away. The police were summoned to the motel, where they questioned and released Berndt and the Windemuths. Berndt and the Windemuths left town together that night. Berndt was eventually arrested in Oklahoma on an unrelated outstanding warrant. During a search incident to arrest, the police found a letter Berndt had written to the FBI. In the letter, Berndt confessed that he had killed a police officer

in California. Two California officers, Jerome Beck and Dominick Rivetti, flew to Oklahoma to interrogate Berndt. During that questioning, Berndt told Beck and Rivetti about his involvement in the Tin Horn robbery.

Beck and Rivetti called the Phoenix police and were put in touch with Detective Joe North. North also flew to Oklahoma and interrogated Berndt about the Tin Horn robbery. After interrogating Berndt, North was convinced that Berndt, Cihak and defendant were responsible for the Tin Horn robbery, and that the Windemuths were potential witnesses. Since Beck and Rivetti were also interested in questioning the Windemuths and defendant, they arranged to keep in touch with North.

On Saturday, March 7, 1981, defendant was arrested in Tucson on an outstanding warrant for the Cihak shooting. Arrangements were made to send defendant to Phoenix. On Monday, March 9, 1981, North learned that defendant was being transported to Phoenix. He called and left word with Beck and Rivetti, who arranged to fly to Phoenix that night. By coincidence, North was scheduled to go to Arkansas the next morning to see the Windemuths.

On the evening of March 9, North contacted defendant at the Maricopa County Jail. North advised defendant of his rights and interrogated him about the Cihak shooting. Defendant responded to the interrogation. North then began to interrogate defendant about the Tin Horn robbery. Defendant denied any knowledge of the robbery and stated that he did not want to talk about it. North persisted in interrogating defendant about the Tin Horn robbery and defendant answered, "I think right now we better stop and let me talk to a lawyer cause I don't know anything about ———— [sic], if its okay with you." North acknowledged defendant's request for an attorney and stated that he would not ask anything else about the Tin Horn robbery. North then *immediately* asked, "Let me ask you thing [sic] about what you might have heard about what [Berndt] said. Will you talk to me about that for just a second?"

North then acknowledged that he understood defendant did not want to talk any more, but stated he wanted to question defendant further about Berndt's activities in relation to the California charges and stated, "I'm not going to ask you anything else about [the Tin Horn matter] ... and even if I did, it wouldn't be admissible in court." Defendant agreed and North then interrogated defendant regarding his knowledge of Berndt's prior criminal activity. While this interrogation focused on Berndt, it included questions regarding defendant's criminal record, his involvement with Berndt *and* Berndt's gun. North also informed defendant that Berndt had talked to the police.

At the conclusion of this interrogation, North told defendant that Beck and Rivetti "are going to come in town tonight to talk to you. They are going to come over here tomorrow to talk to you. Obviously, you don't have to talk to them. Right? That's your right, I've already told you that. But will you talk to them as you've sat here and talked to me?" Defendant agreed to talk to Beck and Rivetti.

The next day, Beck and Rivetti took defendant from the county jail to the Phoenix police station around 1:00 p.m. En route and at the police station, the officers questioned defendant without reading him his rights. This interrogation focused on Berndt and the shooting of the California officer, but included questions concerning defendant's bus ride with Berndt and Berndt's gun. The officers also informed defendant that they had talked to Berndt and Cihak. At the station, Beck and Rivetti turned on their tape recorder and again questioned the defendant without having advised him of his rights. This second, taped interrogation covered the same subjects previously discussed.

Beck testified that after the tape recorder was turned off, defendant stated that he would like to make a statement to North about the Tin Horn robbery. Beck informed defendant that North was not available, but that they were willing to take a statement. The tape recorder was then

turned on and defendant was advised of his rights. Defendant was also asked, "Can we talk among ourselves right now without a lawyer?" and responded, "Yes, sir, we can." Beck then interrogated defendant about the Tin Horn robbery, at which time defendant admitted his participation in the robbery and murders (hereinafter referred to as the "Beck confession").

Beck informed Phoenix police officers Gus Oviedo and Emmet Quill of defendant's confession. At 5:30 that evening, Oviedo and Quill contacted defendant at the county jail. They advised defendant of his rights and interrogated him about the Tin Horn robbery. Defendant responded to the questions and then accompanied the officers to the area near the motel and directed them to the place where he had hidden after the Cihak shooting and had disposed of bullets from the murder weapon. (These statements will hereinafter be referred to as the "Quill confession.")

## MIRANDA RIGHTS

Defendant moved to suppress all his statements and the fruits of the statements made after he invoked his right to silence and requested counsel. The judge suppressed defendant's March 9 statements to North, defendant's March 10 statements to Beck and Rivetti during the initial unrecorded interrogation and the recorded interrogation concerning Berndt. The judge based his ruling on a finding that the "statements were the result of interrogation initiated by law enforcement officers after the defendant had specifically requested the presence of an attorney prior to any further interrogation, *Edwards v. Arizona*, [451 U.S. 477], 101 S.Ct. 1880 [68 L.Ed.2d 378] (1981), and because prior to making said statements the defendant was not advised of, nor did he voluntarily waive, his rights under *Miranda v. Arizona*, [384] 389 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966)." We agree with this ruling. The judge, however, also ruled that the Beck and Quill confessions were voluntary and were made after a knowing and intelligent waiver of defendant's right to silence and

right to counsel. We do not agree with this ruling.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court set out the procedure to be followed when a person subjected to custodial interrogation asks to consult with a lawyer. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court acknowledged that the defendant may waive this right after having asserted it. The Court held, however, that "a valid waiver of that right cannot be established by showing only that [the defendant] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484, 101 S.Ct. at 1885 (footnote omitted). The Court noted that an assertion of the right to counsel is a significant event and emphasized that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* at 485, 101 S.Ct. at 1885. The Court therefore announced a rule that:

> [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with police.

*Id.* at 484–485, 101 S.Ct. at 1885.

The question here, then, is whether defendant waived his right to remain silent and to have counsel present when, after Beck finished questioning him about Berndt's involvement with the California charges, defendant stated that he would like to talk to North about the Tin Horn robbery. The State argues that after defendant invoked his right to counsel, the officers refrained from further interrogation regarding the Tin Horn matter until the defendant asked to make a statement

**86**

on that subject to North. The State contends, therefore, that defendant's request to make a statement was a waiver of his previous request for counsel because, in accordance with *Edwards,* it was the defendant who initiated the Tin Horn interrogation. We disagree.

The record compels the conclusion that defendant was subjected to custodial interrogation regarding the Tin Horn robbery subsequent to his request for counsel. Immediately after defendant requested counsel, he was questioned by North about "what Berndt said" and the next day was questioned again about Berndt by Beck and Rivetti. These interrogations were police initiated and, while directed toward the unrelated charges against Berndt, were inextricably related to the Tin Horn robbery. While the focus of these interrogations was on defendant's knowledge of Berndt's past criminal activities, especially the California charges, all officers were well aware that Berndt had already confessed to the Tin Horn robbery and had implicated the defendant. In addition, North's interrogation included questions about defendant's criminal record, defendant's involvement with Berndt, defendant's bus trip to Phoenix with Berndt and defendant's knowledge about Berndt's gun, which was the murder weapon used at the Tin Horn robbery. The later interrogation by Beck and Rivetti had a similar focus.

■ The fifth amendment protection against self-incrimination "not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence ...." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). In defining the procedural safeguards of the fifth amendment, the Supreme Court has held:

[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* re-

fers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (footnotes omitted). An incriminating response is "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. at 1690 n. 5.

■ The questions asked by the officers which led to defendant's "volunteering" that he wished to make a statement about the Tin Horn robbery cannot be said to fall into the category of questions "normally attendant to arrest and custody." *United States v. Downing,* 665 F.2d 404, 406–07 (1st Cir.1981); *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1112–13 (2d Cir.1975). We believe it apparent that the questions concerning defendant's relationship with Berndt were of the type which the police should have known were reasonably likely to produce answers which could be used to link defendant to the Tin Horn robbery. While we do not reach the question of whether, after a defendant has invoked the right to counsel, the police may interrogate him on a totally unrelated subject,[1] we hold here that continuation of questioning on subjects related to the offense under investigation after a suspect has requested counsel is interrogation inconsistent with *Miranda* and its progeny. *See State v. Emery,* 131 Ariz. 493, 642 P.2d 838 (1982) (holding that officers' discussion about the death penalty after defendant had invoked his right to silence was the functional equivalent of interrogation).

■ Defendant's eventual expression of a desire to confess without seeing counsel occurred at the end of the final interrogation by Beck and Rivetti and immediately after he had been subjected to improper

1. Cf. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (holding that interrogation on unrelated subjects is permissible after invocation of the right to silence).

interrogation by them. The defendant was still in the same room and in the presence of the same two officers. Under these facts, we hold as a matter of law that the trial court's finding that defendant had waived his previously invoked right to counsel and had "initiated" the contact with the officers which led to his confession is unsupported by the record and is legally erroneous. *See State v. Finehout,* 136 Ariz. 226, 231, 665 P.2d 570, 575 (1983); *see also Brewer v. Williams,* 430 U.S. 387, 397 n. 4, 97 S.Ct. 1232, 1238–39 n. 4, 51 L.Ed.2d 424 (1977). We also note that defendant's interrogation by Oviedo and Quill was at the initiation of the Phoenix police officers who had been informed of defendant's confession to Beck and Rivetti. We hold, therefore, that the trial court erred in failing to suppress the Beck and Quill confessions and the fruits of those confessions.

### VOLUNTARINESS

■ Aside from the *Miranda* violations, defendant argues that the judge erred in ruling that defendant's confessions were voluntary. Confessions are prima facie involuntary and the state must prove by a preponderance of the evidence that the defendant's statements were freely and voluntarily made. *State v. Finehout,* 136 Ariz. at 231, 665 P.2d at 575; *State v. Knapp,* 114 Ariz. 531, 538, 562 P.2d 704, 711 (1977). The determination of the trial judge that a confession was voluntary will not be disturbed on appeal absent clear and manifest error. *State v. Knapp, supra.*

■ Defendant argues that his confessions were involuntary for two reasons: (1) they were induced by a promise; and (2) defendant did not receive a timely initial appearance. The rule in Arizona is that a confession induced by a direct or implied promise, however slight, is involuntary. *State v. Jerousek,* 121 Ariz. 420, 424, 590 P.2d 1366, 1370 (1979); *State v. McFall,* 103 Ariz. 234, 236, 439 P.2d 805, 807 (1968). Defendant argues that his confessions were induced by a promise that they would not be used against him. After defendant requested counsel and while he was being interrogated by Detective North "about Berndt," the following exchange took place:

[North]: It is very important that if [Berndt] did tell you anything about what he had done, and this doesn't involve you at all, you're not hurting yourself. Alright, you've already told me you don't want to talk to me anymore about what you did [the Tin Horn] and I'm not going to ask you anything else about what you did from this point on.

[Defendant]: Okay.

[North]: And even if I did, it wouldn't be admissible in court. You know enough about the law to know that, don't you?

[Defendant]: Yes.

[North]: Once you said you don't want to talk to me about that, anything else you tell me can't be used against you. So anything you tell me from this point on is, you know, can't be held against you.

While we strongly disapprove of continued questioning after a suspect has invoked his rights, we do not believe that North's statements constitute a "promise" within the scope of Arizona decisions. The statements did not offer any benefit to the defendant in exchange for information. *Compare State v. Burr,* 126 Ariz. 338, 340, 615 P.2d 635, 637 (1980) (defendant led to believe he would not be prosecuted if he agreed to give police information concerning a crime); *State v. McFall, supra* (drug-addicted defendant led to believe he would be given drugs if he cooperated); *see also State v. Jerousek, supra; People v. Jimenez,* 21 Cal.3d 595, 611–12, 580 P.2d 672, 681–82, 147 Cal.Rptr. 172, 181–82 (1978).

■ Moreover, for a promise to render a confession involuntary, the defendant must have relied on the promise in making the confession. *State v. Hall,* 120 Ariz. 454, 457, 586 P.2d 1266, 1269 (1978). The facts in this case do not support a finding of reliance. Defendant did not confess until the day after North's statements and after he had been read his *Miranda* rights and

informed that anything he said could be used against him.

Defendant also argues that his confessions were involuntary because the police prevented him from getting counsel on March 10. Defendant argues that because he was removed from the county jail by Beck and Rivetti he missed his initial appearance, at which time counsel would have been appointed. *See* Ariz.R.Crim.P. 4.1 and 4.2.

 We have previously held that the time elapsing between a defendant's arrest, confession and initial appearance is a factor to be considered by the trial judge in determining the voluntariness of the confession. *See State v. Arnett,* 119 Ariz. 38, 44, 579 P.2d 542, 548 (1978); *State v. Everett,* 110 Ariz. 429, 432, 520 P.2d 301, 304 (1974). However, the voluntariness of a confession is to be determined by assessing "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *State v. Knapp, supra; State v. Arnett, supra.* The court must determine whether the confession was the "product of an essentially free and unconstrained choice by its maker" or whether "his will has been overborne and his capacity for self-determination critically impaired." *Schneckloth,* 412 U.S. at 225, 93 S.Ct. at 2047.

 Even assuming that defendant was entitled to an initial appearance on March 10, and missed it because he was taken to the police station to be interrogated about Berndt, we do not find that the totality of the circumstances of this case were such that defendant's will was overborne. We note that defendant had a lengthy criminal record and thus was familiar with police procedures. Defendant had completed the tenth grade and indicated that he could read and write. Defendant claimed to have a drinking problem which impaired his memory, but defendant was not drunk at the time of the interrogations and appeared to understand the questions asked and give responsive answers. While defendant was interrogated three times, the interrogations were not lengthy and occurred over a two-day period, allowing defendant to sleep and eat between interrogations. We also note that prior to defendant's actual confessions, he was again read his *Miranda* rights and indicated he understood those rights.

 Thus, while we find that defendant's confessions were obtained in violation of *Miranda v. Arizona, supra,* and *Edwards v. Arizona, supra,* we find, nevertheless, that the confessions were the product of an "essentially free and unconstrained" choice of the defendant. Since the Beck and Quill confessions were obtained in violation of *Miranda* and *Edwards,* it was error to consider them at trial. Since they were not coerced, that error does not require reversal absent prejudice. *See California v. Chapman,* 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 827–28 n. 8, 17 L.Ed.2d 705 (1967).

## PREJUDICE

 The test to determine whether error mandates reversal requires the reviewing court to ask whether, absent the error, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. *United States v. Hasting,* —— U.S. ——, ——, 103 S.Ct. 1974, 1979–1980, 76 L.Ed.2d 96 (1983); *State v. McVay,* 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980). In making this determination, we bear in mind the potential effect when a trier of fact hears a defendant's confession. *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *State v. Adamson,* 136 Ariz. 250, 267, 665 P.2d 972, 991 (1983) (Feldman, J., dissenting). A review of the record, however, reveals that the improperly considered confession was merely cumulative of other, overwhelming evidence on the same point. *See Harrington v. California, supra.*

 In the packet of exhibits submitted to the trial court were statements and investigatory reports which contained many facts about the police investigation. Since these reports were submitted for consideration without any impeaching evidence or

objection regarding hearsay or other matters, we must take the facts contained in the documents as established. Statements in the file indicate that defendant told his employer's brother that he had killed three people in a robbery in Phoenix and that defendant confessed to the Tin Horn robbery and murder to a cellmate in the Maricopa County Jail. Defendant also told Joyce Windemuth he had killed the people in the bar and when she asked him why, he told her he did it so he would leave no witnesses to identify him.

Also included in the packet of exhibits were the statements of the accomplices Cihak and Berndt. These statements establish all of the facts in the improperly considered confessions. Cihak stated that defendant had the gun, defendant walked in the bar first, and that defendant made the three victims lie down on the floor and stood over them with the gun. Cihak looked away and then heard the firing. Cihak stated that neither he nor Berndt was armed.

Berndt stated that upon entering the bar defendant removed the gun from the holster. Berndt recognized the gun as his. After the victims had been made to lie on the floor, Berndt saw defendant point the gun at the first of them and saw defendant fire the gun and the bullet strike the first victim in the head. Berndt also stated that defendant was the only one of the three robbers who had a gun. Berndt saw defendant stand over the other two victims and fire the gun at their heads. Back in the motel room, Berndt saw defendant unload the five spent shells from the gun. Statements from the Windemuths were also included. Roger Windemuth saw defendant return to the motel room and unload Berndt's gun. Defendant had removed the gun from the holster. Joyce Windemuth saw the same thing.

In light of the foregoing evidence, we do not believe that the erroneous admission of the Beck and Quill confessions mandates reversal. There is here direct evidence of defendant's guilt, indirect evidence also clearly establishing defendant's guilt, and

defendant's own confessions to Joyce Windemuth, the cellmate and the employer's brother. Under these circumstances, we believe the erroneous admission of the confessions did not have any significant impact upon the findings of the trial judge. We need not weigh conflicting evidence, for there is none. We need not weigh evidence, for the unimpeached, uncontroverted and unrebutted evidence before the trial judge makes it apparent that the confessions in question are no more than cumulative evidence in a case submitted to the court without a jury and do not require reversal. *Harrington, supra.*

## SENTENCE

The defendant was sentenced to death based on the judge's finding that there were no mitigating circumstances sufficiently substantial to call for leniency and the murders were committed for pecuniary gain. Defendant argues that the sentence of death was based on evidence the judge was not entitled to consider. At the sentencing hearing, the State offered two witnesses and then requested that "the court take notice of the evidence presented to the court for the trial of the matter of Mr. Hensley's guilt." Defendant's counsel objected and argued that the packet of exhibits was submitted only for the determination of guilt or innocence and did not meet the standards for evidence which may be considered at sentencing.

A.R.S. § 13–703(C) governs the evidence which may be considered at sentencing and states in part:

[T]he admissibility of information relevant to any of the aggravating circumstances ... shall be governed by the rules governing the admission of evidence at criminal trials. Evidence admitted at the trial, relating to such aggravating or mitigating circumstances, shall be considered without reintroducing it at the sentencing proceeding.

The State argues that since the packet of exhibits was evidence admitted at the trial, it "shall be considered" at sentencing without reintroduction. The State urges that

**90**

the defendant "did have a trial—one based on materials he agreed to submit and did submit to the fact-finder of his choice, the trial judge." The State is technically correct, and in ordinary circumstances the statute would require that evidence admitted at the trial be considered at sentencing without reintroduction, even though that evidence was admitted by stipulation and much of it would not have been admissible absent such stipulation. However, in this case the result reached is that a stipulation which by its terms only permitted the use of otherwise inadmissible evidence at the trial on the question of guilt or innocence was used to relieve the State of its obligation to prove aggravating circumstances in accordance with the rules of evidence. (A.R.S. § 13–703(C).) Nothing in the record supports a finding that the parties clearly intended such a result. We note, instead, that the discussions of the parties concerned only the use of the packet of exhibits for the trial to determine guilt or innocence. The judge carefully warned defendant that he was giving up his right to a jury trial on the question of guilt or innocence, but did not indicate in any manner that if he was found guilty defendant was also waiving his right to put the State to its proof on the existence of aggravating circumstances which, if found, might require the imposition of the death penalty. The objection and argument of defense counsel at the time of the sentence hearing indicates that he neither had intended, realized nor warned the defendant that the stipulation on submission of the packet of exhibits for the purpose of determining guilt or innocence would result in the use of that entire packet to prove aggravating circumstances at the sentence proceedings.

We do feel that it is incumbent upon defense counsel to thoroughly consider and explicitly state the possible effects of a stipulation prior to its submission. Ordinarily, the consequences of failing to do so must be borne by the client. However, where the issue involves imposition of the death penalty, we do not believe that a stipulation should be given any broader effect than that which the record clearly establishes was intended and discussed by the parties. In these circumstances, therefore, we hold that the intended effect of the stipulation should not be broadened by the technical application of a statute when defendant and his counsel evidently failed to foresee such a result. Therefore, in the absence of a record which shows that defendant clearly intended to waive his right to have the State prove by admissible evidence the aggravating circumstances on which the question of the death penalty revolved, we must give the defendant the benefit of the hearing procedures established by law. We therefore hold that the court erred in sentencing by considering materials which had been submitted under a stipulation permitting their use for determination of issues of guilt or innocence. We therefore vacate the sentence and remand for resentencing pursuant to a hearing at which the State may submit such evidence on aggravation as is permissible under the applicable rules, after which the defendant may be resentenced by the court. At the new hearing, the packet of exhibits which the court previously considered may be used and considered on all issues except those pertaining to proof of aggravating circumstances.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.