792 P.2d 769

**In the Matter of the APPEAL IN PIMA COUNTY JUVENILE DELINQUENCY ACTION NO. 97036–02.**

**No. 2 CA–JV 89–0039.**

Court of Appeals of Arizona, Division 2, Department B.

Feb. 22, 1990.

Review Denied June 19, 1990.

---

1. $120,000 + $250,000 = $370,000 which is approximately 55 percent of $650,000.

Dan W. Montgomery, David W. Rees, Tucson, for minor.

Stephen D. Neely, Pima County Atty., by Terry L. Chandler, Tucson, for State.

Sarah Michele Martin, Tucson, Guardian ad Litem.

## OPINION

LIVERMORE, Presiding Judge.

The minor was charged with two counts each of child molestation, sexual conduct with a minor under 15, kidnapping and aggravated assault. Following a contested hearing, the juvenile court adjudicated the minor delinquent on one count of child molestation and sexual conduct with a minor under 15 and two counts of aggravated assault. Because we find two issues to be dispositive of this appeal, we do not address the other issues raised by the minor.

The charges arose out of an incident in which the minor, a 13-year-old boy, was babysitting for two young children of another family, a seven-year-old girl and a

three-year-old boy. The parents had planned to participate in a car show which required them to be at Reid Park in Tucson at 5:00 a.m. on October 8, 1988. They arranged for the minor to sit for the children and picked him up at approximately 4:30 a.m. The children's grandmother, who lived nearby, had arranged for all three children to come to her home to go swimming after lunch. When they arrived, she observed that her grandson's face appeared bruised and swollen. The granddaughter also had welts on her buttocks and legs. The girl also cried out in pain when she urinated.

The grandmother and mother took the children to the hospital to be examined. The girl testified that the minor had beaten both of them with belts. She also testified that he had made the children dress up in each other's clothes and discussed sexual conduct with them. She further testified that he had blindfolded her and made her brother lie down on top of her. She then felt something painful in her vagina and heard the minor make a panting noise. Although the girl testified as to other conduct by the minor, in light of the juvenile court's dismissal of the charges arising out of that alleged conduct, we need not address the remainder of her testimony.

At the hearing, the examining physician at the hospital testified that he had observed abrasions of the girl's labia and had been unable to see the hymen, but could not state positively whether it was intact. Both the examining physician and another expert, who examined photographs of the children, testified that the injuries to the children's buttocks and the boy's face were consistent with being struck by a belt. They further testified to their opinion that the abrasions to the girl's labia and vagina and the inability to see the hymen were the result of penetration by some object. The minor's expert, who did not examine the girl but reviewed the same photograph of the child's vaginal area, testified that the redness and swelling were not the result of trauma, but were probably secondary to an infection.

On October 13, 1988, after she had interviewed the parents and grandmother of the victims, Deputy Sheriff Jolene Ross of the sex crimes unit went to the minor's junior high school to interview him. Also present and participating in the interview was Detective Skip Woodward, a Tucson Police Department school resource officer. The interview, which was tape recorded, lasted approximately two hours. Although neither the tape nor a transcript was admitted into evidence, lengthy portions of the interview were read into evidence by Detective Ross.

The minor was given *Miranda* warnings, acknowledged that he understood them and agreed to answer questions. The minor testified that he was never told that he could have his parents present for the interview; Deputy Ross's testimony on this point was equivocal. The minor testified that initially he denied hitting the children because he was afraid of the officers. He later admitted hitting the children with a belt but denied any sexual acts with them. After persistent questioning, however, he acknowledged that the children had taken off their clothes and that the boy had lain on top of the girl at his direction. At the hearing, the minor admitted hitting the children with a belt. However, he denied any sexual conduct with the minors and testified that he had made the statements regarding such conduct as a result of a "promise" from the officers during the interview. When asked, "What promise?" he testified:

> That it was—like her promise. Skip Woodward, and we call him Skip, because he is the school thing—officer, because he said that this could be over in five minutes if you tell us so and so and we know that you did it and we can prove it to the court and so and so, and so I just told them, I got kind of confused, and I just told them what they wanted to hear, and then I though[t] about that, it was kind of stupid.

He further testified "she kept telling me that I did this and they knew I did this, so I told them what they wanted to hear in order to get out of there."

During cross-examination of Deputy Ross, lengthy portions of the interview were read into the record. The minor was told by Officer Woodward that a doctor had done a "real thorough examination of [the girl]" and "somebody molested that little girl that day," even though neither officer had spoken to the doctor or seen his reports. The following transpired:

Q. Did you feel that this was proper technique, to mix these representations and to lie to this boy in order to get a statement from him regarding this case?

A. It's used sir. It's used as part of our technique.

Q. So it's part of your technique to tell stories and mistruths and half truths in order to elicit statements from a person who is suspected of a crime, is that you[r] statement?

A. It's part of it sir.

Q. Did you ever think that a 13 year old boy might be believing everything that you said?

A. I don't know sir. I don't have any opinion on that question.

Q. Okay, you were just doing your job?

A. I was just doing my job.

Q. Page 17. You didn't say this, but I assume that you were still in the room with Detective Woodward when he says, at the top of the page, I understand that you don't want to say that you did, okay, but David, is what you need to understand is *nothing more is going to happen to you whether you hit [the girl] once with the belt, or whether you hit her with the belt three or four or five times. Nothing more is going to happen to you if you slapped [the boy] in the face one or three or four times, or five times.* That wasn't truthful was it?

A. I have no idea what he was trying to get at with that sir. That was not proper questioning.

Q. That was not proper interrogation, because he was making a promise, and that is not appropriate is it?

A. That wasn't my question.

Q. But you let it continue didn't you? Even though you knew it was improper interrogation.

A. Well he kept on talking.

Q. You knew that something more was going on, and you knew something more was going to happen to David at this point, and you knew that you were going to arrest him for aggravated assault?

A. Yes.

 *     *     *     *     *     *

Q. Detective Woodward continues on in the middle of this page in a rather lengthy statement starting about a third sentence down. Do you see there where it says, now the doctors have examined the kids, and they said these kind of things have happended [sic] or did happen, and they only could have happened in the time when you had the kids, so somebody had to do it. And what happens is when we go down to Juvenile Court they will have a court hearing in front of a Judge, and these two kids will have to come in and testify in front of the Judge, and they'll have to go over all this and tell what happened, *and then it will be your turn to get on the stand and tell your side of the story. And then the Judge will decide who he's going to believe,* and it's best for you to tell us the truth right now, and get it over with rather than to prolong this or delay this any further. You're already halfway there. Do you see that portion?

A. Yes.

 *     *     *     *     *     *

Q. Okay. You didn't stop him or clarify that did you?

A. No.

Q. You didn't say, wait a second. Where did you get this information?

A. No.

Q. What about the business about Detective Woodward saying, you got to get up and tell your side of the story. Did you hear that when that was said, when he told [the minor] that he would have to tell his side of the story?

A. Yes.

Q. Did anybody advise [the minor] that they don't have to get up on the stand in a criminal case and tell their side of the story if they don't please to?

A. No sir.

(Emphasis added.) The minor was further told by Woodward:

> [W]e know that you hit both of these kids with a belt. We know that you slapped [the boy] in the face several times with your hand, and we know that you, that you did have some kind of sexual contact with both of these kids, but we just don't know why, and we honestly want to know your side of the story, and you will feel better if you tell us the truth, because you, your [sic] the only person who could have done this.
>
> \* \* \* \* \* \*
>
> You probably didn't do it exactly the way we are telling you it happened, but you did do the sexual stuff.... There's no doubt that you did do it and we can prove that in Court without any problems, but right now we are giving you the chance to tell your side of the story, and it's, I know you're not going to enjoy telling us and it's going to be embarassing for you, but you need to do it.

The minor was again asked if he had put his finger inside the girl, and again denied it. The minor was then questioned again about hitting the children, and Ross stated:

> But you told me a couple different things now. First you're saying you didn't make um, then you said well, yeah, I, I, I made a couple of um, what is it ...? The other marks didn't automatically appear there. They're very distinctive. The doctors can tell us exactly just about how many times those children were hit with the belt and hit with a hand. They can also tell me what belts were used. *Now, how do I explain this, how do you explain it? I don't have to explain anything, you have to. You need to tell the truth and you're not doing that.*

(Emphasis added.) Six pages later in the transcript, Detective Woodward states:

> [W]e really truly want to help you, but we can't help you if you don't want to help yourself. *The only way you can help yourself right now is to tell the truth then we'll help you, but we can't without you telling us the truth.* The, the first step towards helping yourself is to tell the truth and nobody has ever been helped unless they wanted to help themselves first though. And so, we're giving you one more chance to tell us the whole truth, and you can do it. You need to tell us that and get it over with, get it off your chest. Get it over with and I'll tell you what, you are going to feel like you're going to explode inside holding this kind of stuff in, because it's not going to stop here, it's just not going to go away. *It's going to go to the prosecutor's office and [the children] are going to be interviewed some more, and more questions are going to be asked. Coming back and asking more questions, and you can get the whole thing out right now by, we know what you did, but we just need you to tell us and it will be over in five minutes. You can just tell us and then we'll get you some help and it will be done with.*

(Emphasis added.)

Rule 18, Ariz.R.P.Juv.Ct., 17B A.R.S., provides:

> No extra-judicial statement to a peace officer or court officer by the child shall be admitted into evidence in juvenile court over objection unless the person offering the statement demonstrates to the satisfaction of the court that: The statement was voluntary and before making the statement the child was informed and intelligently comprehended that he need not make a statement, that any statement made might be used in a court proceeding, and that he had a right to consult with counsel prior to making a statement and during the taking of the statement, and that, if he or his parents, guardian or custodian could not afford an attorney, the court would appoint one for him prior to any questioning.

The minor argues that his subsequent incriminating statements during the interview were the result of the officers' promise of leniency as demonstrated by the fore-

going excerpts and should have been suppressed. We agree.

The juvenile court's admission of a minor's confession will not be disturbed on appeal absent clear, manifest error. *Appeal in Maricopa County Juvenile Action No. J–84357*, 118 Ariz. 284, 576 P.2d 143 (1978). Under Rule 18, the voluntariness of a juvenile's statement is judged according to the totality of the circumstances. *Appeal in Maricopa County Juvenile Action No. J–88515*, 139 Ariz. 260, 678 P.2d 445 (1984); *State v. Jackson*, 118 Ariz. 270, 576 P.2d 129 (1978).

In this case, a 13–year–old boy was subjected to a two-hour interrogation by two police officers in the absence of his parents. Although he was initially given *Miranda* warnings and told that he had the right to remain silent, he was subsequently told, to the contrary, that he would have to go to court and tell his story to a judge. When his answers did not satisfy the officers, he was again told that he would have to "explain" what happened. When the minor persisted in denying the accusations of sexual conduct, he was again told that he would have to go to court but that the officers could "help" him if he told the truth and that it would be "over in five minutes. You can just tell us and then we'll get you some help and it will be done with." Fairly construed, the officers' statements not only misrepresented to the juvenile his rights in a juvenile proceeding but also conveyed to him that if he gave answers satisfactory to them, they would help him and he wouldn't face charges. Under the totality of the circumstances, the minor's statements following upon the officers' misrepresentations and promises were not voluntarily given and should have been suppressed.

In determining whether the error in admitting the minor's statements requires reversal, the test in the context of a jury trial is "whether, absent the error, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *State v. Hensley*, 137 Ariz. 80, 88, 669 P.2d 58, 66 (1983). In a trial to the bench, however, the rule has been stated

that "the appellate court will assume, unless it affirmatively appears to the contrary, that the trial judge only considered the competent evidence in arriving at the final judgment." *State v. Warren*, 124 Ariz. 396, 402, 604 P.2d 660, 666 (App. 1979). In this regard, Judge Kaufman's opinion in *Hawkins v. LeFevre*, 758 F.2d 866, 878 (2d Cir.1985), is instructive:

We pause to comment briefly upon the implications arising from the fact that the constitutional error occurred in the context of a bench trial. Our system of justice presumes that judges enjoy the capacity to consider only relevant evidence in determining an individual's guilt or innocence. We vest judges with the authority to grant motions to suppress improperly seized evidence, while at the same time empowering them to pass on an individual's guilt, confident that the inculpatory evidence will remain outside their decisional calculus. But there comes a point where we are unable to indulge in the comfortable fiction that judges can edit their thought processes to exclude that which is impermissible and include only that which is permissible.... Insofar as an efficacious harmless error standard evinces a sensitivity to the imprint a particular error leaves on the judicial process, the trial judge's contravention of fundamental constitutional rights cannot be dismissed as harmless.

In the present case, the juvenile judge admitted the juvenile's incriminating statements to the officers along with a great deal of other evidence, including expert testimony which was conflicting as to the cause of the abrasions on the girl's vaginal area. On this record, we cannot say that the erroneously admitted statements were not relied upon by the juvenile court in adjudicating the minor on the sexual conduct and molestation charges. We therefore vacate the adjudication order as to those charges.

As to the charges of aggravated assault, the minor admitted on the stand that he had hit the children with a belt. Although, as noted above, the transcript of

his statement was not admitted into evidence, it appears from the cross-examination of Deputy Ross that his admission of this conduct during the interview preceded the officers' misrepresentations and promises to him. Under these circumstances, reversal of the adjudication on the aggravated assault charges is not required.

The minor contends, however, that the evidence is insufficient to support the adjudication on the aggravated assault charges. Specifically, he contends that there was no proof either that the children had suffered serious physical injury or that the belt constituted a deadly weapon or dangerous instrument. *See* A.R.S. § 13–1204(A)(1) and (2). Assuming, *arguendo*, that the evidence is insufficient under § 13–1204(A)(1), we believe that the evidence supported a finding that the belt was a dangerous instrument under § 13–1204(A)(2).

Under A.R.S. § 13–105(8), "dangerous instrument" is defined as "anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury." Dr. Jones, testifying for the state, testified that striking a three-year-old or a seven-year-old child with a belt could cause serious physical injury and possibly death. This was sufficient to support the juvenile court's findings.

Because the minor's remaining claims pertain to the charges of sexual conduct and molestation, we need not address them. The adjudication order is vacated as to the charges of child molestation and sexual conduct with a minor; the order is affirmed as to the charges of aggravated assault.

FERNANDEZ, C.J., and LACAGNINA, J., concur.