676 P.2d 615

**STATE of Arizona, Appellee,**

v.

**Ruben Soza CORRALES, Appellant.**

No. 5153.

Supreme Court of Arizona,
En Banc.

Dec. 15, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Michael D. Jones, Asst. Attys. Gen., Phoenix, for appellee.

James W. Stuehringer, Tucson, for appellant.

FELDMAN, Justice.

Defendant, Ruben Corrales, was convicted of first degree murder, kidnapping, aggravated assault, second degree burglary and theft of property valued at more than $1,000. He was sentenced to life imprisonment for the murder and received the presumptive sentences on the remaining offenses. All sentences were to run concurrently. Defendant appealed his conviction, and also sought post-conviction relief under Rule 32, Ariz.R.Crim.P., 17 A.R.S. We ordered the appeal consolidated with defendant's petition for review of the denial of relief under Rule 32. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031 and 13–4123.

The principal contentions advanced by defendant relate to the witness Luis Arias. Defendant contends that the trial court erred in permitting the prosecutor to call Arias, defendant's alleged accomplice, when court and counsel were aware that the accomplice would claim the privilege against self-incrimination and refuse to testify. Arias did refuse to answer any questions, and defendant claims that the trial judge erred even more seriously in permitting the prosecutor to continue to ask Arias certain questions which implied defendant's

guilt. Defendant claims that these procedures violated his sixth amendment right to confrontation (as made applicable to the states by the fourteenth amendment) and also violated his fourteenth amendment right to due process and a fair trial. U.S. Const. amends. VI and XIV.

## FACTS

Some time during the early hours of May 16, 1979, the home of the victim, Mary McDiarmid, was burglarized. Ms. McDiarmid, an 81-year-old retired school teacher, was bound and gagged; she died as a result of asphyxiation due to the obstruction of her upper air passage. Several items were taken from her home, including a color television and its stand.

On August 16, 1979, investigating officers located the television at a repair shop. The repair invoice showed that Ruben Corrales had brought the television in for repairs. The police proceeded to the defendant's residence. They were given consent to search defendant's home by defendant's girlfriend. There the police discovered Ms. McDiarmid's television stand, but none of the other items.

A fingerprint check of Corrales' friends revealed that fingerprints found at the McDiarmid residence matched those of Luis Arias. Arias was arrested and confessed to the burglary and murder, implicating defendant. Arias was tried and convicted of the murder of Mary McDiarmid prior to defendant's trial. Defendant's case then proceeded to trial.

The incriminating evidence at defendant's trial was primarily circumstantial. The State produced the television set which defendant had taken in for repairs and identified it as the set belonging to the victim. The State proved Arias' presence in the victim's house and relied heavily on the defendant's connection with him, claiming that defendant had been Arias' accomplice.

The State offered three witnesses who testified that the defendant had made inculpatory statements about the crime. A friend of the defendant testified that defendant told him he had been with Arias outside the victim's house and had helped load the television and a mirror into Arias' truck and had later purchased the television from Arias. The State also called two of the defendant's former cellmates from the Pima County Jail. Both men testified that the defendant had confessed to them on several occasions, telling various stories about his involvement in the death of Mary McDiarmid.

Defendant testified in his own behalf. He said he had been with his girlfriend at the time of the killing, but had later purchased the television and stand from Arias, knowing it had been stolen. The girlfriend supported the alibi claim.

Additional facts will be set forth where necessary in discussion of the legal issues raised by defendant.

## PROPRIETY OF CALLING THE ACCOMPLICE AS A WITNESS

■ The State had little, if any, direct evidence placing defendant in the victim's house. The only direct evidence that existed placed Arias in that house. One of the State's principal contentions was that, if nothing else, defendant had been Arias' accomplice. A felony murder instruction under A.R.S. § 13–1105(A)(2) was sought and given, the State arguing that the defendant had participated in the burglary and kidnapping and was therefore guilty of first degree murder regardless of who had actually done the killing. Since Arias' confession implicated defendant, as soon as Arias had been convicted the State commenced efforts to procure his testimony against defendant. However, Arias' attorney advised counsel and judge that his client would claim the fifth amendment if called to testify. Arias refused to answer any questions on deposition. The State moved to compel Arias to testify at deposition, but the trial judge ruled that Arias could not be compelled to testify until he had been sentenced. After sentencing took place, and before defendant's trial, the State sought an order compelling Arias'

testimony at that trial. Since Arias had been sentenced, the trial judge granted the motion,[1] but commented that "based on everything we have been told by [Arias' attorney] he's not going to testify." Arias' attorney continued to advise him to claim the privilege against self-incrimination. When actually called during the trial, Arias took the stand and refused to answer any questions, except for his name and age.

Defendant claims that the prosecutor's conduct in calling Arias to the stand with reason to believe that he would claim the privilege against self-incrimination constitutes reversible error under the rule of *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). In *Namet*, the Court did indicate that such action by a prosecutor could be error under the theory of prosecutorial misconduct, if it appeared that the government made "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Id.* at 186, 83 S.Ct. at 1154–55. A second theory mentioned in *Namet* is that error is committed in a given case when "inferences from a witness' refusal to answer" add "critical weight" to the state's case and unfairly prejudice the defendant because of his inability to cross-examine a witness who claims the privilege. *Id.* at 187, 83 S.Ct. at 1155. The constitutional bases of the *Namet* rules were recognized and applied to the states in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

We have previously addressed the question of whether reversible error is committed when the court allows a prosecutor to call an alleged accomplice who claims the testimonial privilege as a witness. In *State v. Cota*, 102 Ariz. 416, 432 P.2d 428

(1967), *cert. denied*, 390 U.S. 1008, 88 S.Ct. 1256, 20 L.Ed.2d 109 (1968), we held that the privilege was a "personal immunity for the witness," that the witness was not disqualified from being called to the stand and that even if the state was aware that the witness would invoke the privilege, it "had the right to show that it was presenting all the relevant evidence ...." *Id.* 102 Ariz. at 421, 432 P.2d at 433.

The State claims here that it was proper to call Arias under the *Cota* rule because it had the absolute right to demonstrate to the jury that it was presenting all relevant evidence. We believe it is more accurate to say that the State wished to avoid the danger of a juror making an adverse inference from its failure to call Arias.[2] However it may be phrased, we cannot agree with the State's position. First, although *Cota* was decided after *Namet*, it did not consider the *Namet* rule. Second, we have qualified *Cota*. In *State v. Caldwell*, 117 Ariz. 464, 573 P.2d 864 (1977), we discussed the *Namet* rule and indicated that under particular fact situations, calling the witness to the stand might violate *Namet*. We held the procedure followed in *Caldwell* was not such a situation, primarily because in *Caldwell* the prosecutor was not certain that the accomplice would refuse to answer questions and withdrew the witness as soon as the privilege was invoked. 117 Ariz. at 473, 573 P.2d at 873. Our court of appeals reached a similar conclusion in *State v. Blankinship*, 127 Ariz. 507, 511, 622 P.2d 66, 70 (App.1980).

In the case at bench, the trial judge made findings of fact and conclusions of law in the Rule 32 proceeding. He ruled that the State had a *right* to call all relevant witnesses under the *Cota* rule. We

---

1. The trial judge erroneously based this ruling on the belief that the privilege against self-incrimination did not survive conviction and sentence, even though the judgment of conviction had not become final. We have held to the contrary in *State v. Gretzler*, 126 Ariz. 60, 88, 612 P.2d 1023, 1051 (1980). Arias' conviction was eventually affirmed. *State v. Arias*, 131 Ariz. 441, 641 P.2d 1285 (1982).

2. We note that an adverse inference from failure to call a witness may not be argued by counsel where counsel knows that the witness cannot be produced by his opponent. 1 M. Udall & J. Livermore, Arizona Practice, *Law of Evidence* § 125, at 257 (2d ed. 1982). This rule would certainly be applicable to situations where the witness can be physically produced but cannot be compelled to testify.

think the trial court overstated the law. In addition to the views expressed in *State v. Caldwell, supra,* we have recently retreated from the *Cota* rule "insofar as [it suggests] an *absolute* right to call witnesses regardless of the fact that they may properly choose to invoke their fifth amendment privilege in response to all relevant questions." *State v. McDaniel,* 136 Ariz. 188, 194, 665 P.2d 70, 76 (1983) (emphasis in original) (defendant is not denied his sixth amendment right to compulsory process when he is precluded from calling a witness who intends to invoke the fifth amendment and who can legitimately refuse to answer questions).

While there is no "absolute right" to call the witness, various purposes may be subserved by requiring the privilege to be invoked in the presence of the jury. One proper purpose is to provide the jury an explanation of the failure to call a witness who ordinarily would be expected to testify in order to prove the charge or establish the defense. *See State v. Cota, supra; United States v. Vandetti,* 623 F.2d 1144, 1146–47 (6th Cir.1980). The decision to permit counsel to call a witness who has indicated he or she will refuse to testify is ordinarily discretionary with the trial court, which must determine whether the interest of the person calling the witness outweighs the possible prejudice resulting from the inferences the jury may draw from the witness' exercise of the privilege. *United States v. Vandetti, supra,* n. 1; *People v. Berg,* 59 N.Y.2d 294, 464 N.Y.S.2d 703, 704–05, 451 N.E.2d 450, 451–52 (1983); *cf., State v. McDaniel, supra.*[3]

The court also has discretion to force the privilege to be taken before the jury in cases where, despite his avowed intention, it is possible that the witness will not exercise his privilege or will answer some questions and not others. These are situations in which the testing of the privilege may properly be done before the jury since "apprehended difficulties with proof often evaporate when put to the actual test of the trial." *United States v. Mayes,* 512 F.2d 637, 649 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975). *Mayes* also points out that it is sometimes impossible to know in advance that the privilege will be invoked to particular questions or whether, if invoked, it will be appropriate to a specific question. If the witness will testify at all, the government does have an obligation (and the defendant the right) to present his or her relevant testimony and must have a reasonable opportunity to "test whether that testimony will be forthcoming, and if not, whether it can be compelled." *Id.* That question will ordinarily be put to the strongest test if the witness is forced to exercise the privilege in open court, before judge, counsel and jury.

The correct rule, therefore, is that if the court finds that the fifth amendment will be properly invoked, it has discretion to determine whether to allow the proponent of the evidence to call the witness and elicit the claim of privilege before the jury. It may do so when it finds that some valid purpose, such as those mentioned in the preceding paragraphs, will be served by so proceeding. It may refuse to allow the

---

**3.** In *Berg,* the trial judge allowed the state to force a witness to claim the privilege before the jury in order to provide an explanation for the jurors' natural concern over why the state had failed to produce testimony from the alleged victim of the crime. In *McDaniel,* we upheld the trial court's finding that there would be "no substantive value" (665 P.2d at 75) in allowing defendant to call his alleged accomplices, who had unequivocally and properly indicated that they would claim the privilege, for the purpose of asking them whether they, not he, had committed the crime. Defendant did not seek to call the witnesses to prevent the jury from draw-

ing adverse inferences from defendant's failure to produce their testimony; instead, he sought to call them in order to ask a series of questions, evoke a claim of privilege to each question, and then to argue to the jury that the invocation of the privilege justified an inference that the accomplices and not the defendant had committed the crime. *Id.* 665 P.2d at 76. We held that the trial judge had acted properly in refusing to permit this procedure because "the jury is not entitled to draw any inferences from the decision of a witness to exercise his fifth amendment privilege." *Id.*

witness to be called if it finds that the benefits to be gained will be outweighed by the danger of prejudice. It *must* refuse to allow the witness to be called in those situations where forcing the witness to claim the privilege in front of the jury would violate either prong of the *Namet* rule, (where the prosecution is attempting to build its case out of inferences arising from the use of the privilege or where such inferences may add critical weight to the state's case, thus prejudicing defendant because of his inability to cross-examine).[4]

█ Under the facts of this case, we do not believe the *Namet* rule was violated or that the court abused its discretion by simply allowing the witness to be called to the stand. The prosecutor had been informed that counsel for Arias would advise his client to claim the privilege and that Arias intended so to do. However, the prosecutor had also obtained a ruling that the privilege was not properly available. While the court erred in so holding, it is obvious that the prosecutor did not commit misconduct by following the order which the court had made. *State v. Skinner*, 110 Ariz. 135, 147, 515 P.2d 880, 892 (1973). Acting under the court's ruling that the privilege was unavailable, the prosecutor wished to determine whether Arias' proclaimed intent to follow the advice of counsel would survive the court's admonition to testify, coupled with the threat that Arias would be held in contempt for refusing to answer questions. While it is within the court's discretion to order that such matters be determined initially by calling the witness while the jury has been excused, under the circumstances here we cannot find that merely calling the witness to the stand and procuring his invocation of the privilege violated either portion of the *Namet* rule. *United States v. Mayes, supra. State v. Caldwell, supra. See also* Annot., 19 A.L.R. 4th 368 (1983).

## THE EXAMINATION OF THE WITNESS

### *Fourteenth Amendment Issue*

When Arias was called to the stand, the prosecutor commenced examination as follows:

Q. State your name for the record?

A. Luis Arias.

Q. How old are you, sir?

A. Nineteen.

Q. Do you know the individual sitting in the courtroom, Ruben Corrales?

A. I'm taking the Fifth Amendment, so I won't answer any questions.

█ At this moment in the trial, the prosecutor had determined that the witness would take the fifth amendment despite the court's ruling that it was not available. If the prosecutor had any hope that the resolve of the witness might give way to instructions from the court backed by the power of contempt,[5] the proper procedure would have been to instruct the witness and determine whether he would obey the instructions of the court. Upon finding that the witness intended to follow the advice of his attorney rather than the instructions of the court, the witness could have been withdrawn and no serious harm would have occurred. *State v. Caldwell, supra; State v. Blankinship, supra.*

*Namet* was violated when the court allowed the prosecution to call several alleged accomplices and force each to invoke the privilege before the jury. In such situations, of course, the court must take the claim of privilege outside the presence of the jury.

**4.** Cases holding that *Namet* is violated by the mere act of calling the witness, evoking a claim of the privilege and withdrawing the witness before any suggestive question is asked are scarce. However, we can easily hypothesize situations where the prosecution could add critical weight to its case merely by putting the witness on the stand. For example, if a defendant were charged with selling narcotics and the defendant denied that the transaction involved drugs, forcing the buyer to claim the privilege before the jury might well lend critical weight to the state's case. See also, *United States v. Maloney,* 262 F.2d 535 (2d Cir.1959), holding that

**5.** This was a dubious hope at best, considering the fact that the witness had already been convicted of first degree murder and sentenced to life imprisonment without possibility of parole for 25 years.

■ Unfortunately, the prosecutor in this case did not show restraint; he continued. The questions after Arias invoked the privilege and stated, "I won't answer any questions," were as follows:

Q. Were you *involved with Ruben Corrales* in the burglary and theft of Mary McDiarmid's house?

A. I'm taking the Fifth Amendment.

Q. How long have you *known Ruben Corrales*? How long have you *known Ruben Corrales*?

A. I'm sorry.

Q. Are you going to refuse to answer any questions that I pose?

A. Every question.

(Emphasis supplied.) The prosecutor then asked permission to approach the bench and requested that the court excuse the jury and order the witness to testify. Without excusing the jury, the court turned to the witness and instructed as follows:

THE COURT: Mr. Arias, you are instructed to answer the question of the Pima County Attorney.

THE WITNESS: Sorry, Your Honor, I'm taking the Fifth Amendment. I ain't answering any questions.

Not content, the prosecutor continued:

[THE PROSECUTOR:] May I proceed, Your Honor?

Q. Mr. Arias, you know that you have been ordered by the court to answer questions?

A. [WITNESS TO THE COURT:] Sorry, Your Honor.

Q. Mr. Arias, *were you involved* in the homicide death of Mary McDiarmid *with one Ruben Corrales*?

(Emphasis supplied.) Having been met with silence in response to that question, the prosecutor then asked:

Q. Your answer, sir.

A. I don't know nothing.

Q. You don't know nothing?

A. I don't want to answer any questions.

Not surprisingly, defendant claims that the prosecutor intentionally asked the witness leading questions which explicitly connected the defendant to Arias in the commission of the crime. Defendant urges that this was done in the face of what was by then an absolute certainty[6] that Arias would claim the privilege; that the prosecutor thereby permitted the jury to infer that Arias claimed the privilege in order to avoid giving affirmative answers; and, therefore, that the jury was allowed to draw the additional inference that the defendant had in fact been Arias' accomplice. Defendant claims that this violates both parts of the *Namet* rule. We agree.

It has long been recognized that jurors tend to view a witness' invocation of the privilege as a "clear confession of crime." 8 J. Wigmore, *Evidence* § 2272, at 426 (McNaughton rev. 1961). This is especially true where the witness is closely connected with the defendant by the facts of the case. In such situations, the cases recognize that it is likely that the jurors will infer the witness' guilt and will impute it to the defendant. *See United States v. Ritz*, 548 F.2d 510, 520 (5th Cir.1977); *Lawrence v. Wainwright*, 445 F.2d 281, 282 (5th Cir. 1971); *People v. Poma*, 96 Mich.App. 726, 730, 294 N.W.2d 221, 222 (1980). The manner in which the questions in the case at bench were framed can be taken as nothing but a deliberate attempt to suggest defendant's involvement in the crime and, thus, an invitation to the jurors to infer defendant's guilt from Arias' refusal to answer and deny it. *See United States v. Mayes*, 512 F.2d at 648–49.

Acknowledging the *Namet* rule and its application to state proceedings by virtue of the holding in *Douglas v. Alabama*,

---

**6.** Corroboration, if any were needed, that the witness would continue to invoke the privilege was provided by the witness' counsel, who was present in the courtroom and who joined the bench conference at which the court was asked to instruct the witness to answer the prosecutor's questions. Counsel for the witness informed all parties that he intended to continue to advise the witness to refuse to answer and that the witness intended to continue to follow his advice.

*supra,* the State claims, nevertheless, that it was not prosecutorial misconduct to have pursued the line of questioning followed in the case at bench. The State relies on *State v. Caldwell, supra;* we think the case is inapposite. In *Caldwell,* the prosecutor asked a fairly innocuous question, elicited the claim of privilege, and then withdrew the witness without asking questions which might raise damaging inferences.

▮▮▮ The State then argues that the prosecutor had reason to believe that there was some chance that Arias would testify. The State points out that the trial court concluded as a matter of law that

> [t]he prosecutor was not guilty of prosecutorial misconduct as he was not bound by previous assertions by Arias of his fifth amendment privilege. *Namet v. United States....* In fact Arizona cases indicate that the State has a right to call all relevant witnesses before the jury. *State v. Cota....*

Despite the fact that *Cota* must be qualified, we have agreed with the trial court that calling Arias was not misconduct. The trial court's conclusion of law does not go far enough. The fact that it was permissible to call Arias to ascertain whether he would take the fifth amendment did not make it permissible to continue asking him questions after it had become apparent that he would take that privilege. The law is quite to the contrary. *Fletcher v. United States,* 332 F.2d 724, 726 (D.C.Cir.1964); *United States v. Ritz, supra.* Prosecutorial insistence in asking prejudicial questions depicting a defendant's involvement in the crime *after* it becomes clear that the witness-alleged accomplice has refused and will continue to refuse to testify is an attempt to build the prosecutor's case out of inferences arising from use of the testimonial privilege and is misconduct. *United States v. Mayes,* 512 F.2d at 650; *United States v. King,* 461 F.2d 53, 56 (8th Cir. 1972); *Fletcher v. United States, supra;* Annot., 19 A.L.R. 4th 368, 379–81 (1983); 1 M. Udall & J. Livermore, *supra* § 77 at 155 n. 22. As *United States v. Mayes, supra,*

indicates, "extensive" questioning after it is clear that the witness will continue to invoke the privilege is an unfair trial tactic. 512 F.2d at 650. Here, the privilege was fully tested and it is difficult to imagine how the witness could have been any more definite in stating his intention to continue to invoke the privilege.

The State has also been unable to explain why it was necessary or proper to have phrased the questions in a manner which suggested Corrales' involvement. If it was permissible to have asked any question at that stage of the proceedings—and even that would be dubious—questions could certainly have been addressed in a manner calculated to minimize the chance of the jury drawing impermissible inferences. If the prosecutor's intentions had been proper, he could easily have left Mr. Corrales' conduct and name out of the question. In light of the competence and experience of the prosecutor in question, we are compelled to conclude that the questions were intentionally phrased in order to maximize the chances that the jury would draw the improper inference. This is exactly the type of prosecutorial misconduct proscribed by *Namet.*

### Sixth Amendment Issue

Defendant also claims that the line of questioning pursued after the witness invoked the fifth amendment privilege violated the second of the *Namet* principles. This principle postulates that the sixth amendment right of confrontation is violated when the line of questioning is such that "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Namet,* 373 U.S. at 187, 83 S.Ct. at 1155.

The sixth amendment question thus requires us to determine whether the inferences which the jury could draw from the specific questions and the witness' refusal to answer those questions added "critical weight." The State argues that there was other, independent evidence directly linking

defendant to the perpetration of the crime charged so that the improper inferences were only cumulative and the critical weight test remained unsatisfied. The State contends that it is only where the inferences add a "crucial link" in the proof of the essential elements of the crime that the *Namet* rule is applicable.

The State cites *Rado v. Connecticut*, 607 F.2d 572 (2d Cir.1979), *cert. denied*, 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980), as authority for the proposition that the leading questions to Arias were neither crucial to the State's case nor devastating to Corrales' defense. After close examination of the record before us, we disagree and find *Rado* inapposite. In *Rado*, a witness/accomplice was pressed by the prosecution for details regarding the crime and defendant's involvement in that crime. Unlike the case at bench, the witness in *Rado* was not consistent in invoking the privilege. He had made a plea agreement with the state which called for him to give testimony although reserving his right to invoke the fifth amendment. That witness did testify freely with regard to his relationship with the defendant and did admit the accuracy of extrajudicial statements in which he had implicated the defendant. Moreover, the witness was available for cross-examination,[7] and there was other, independent, direct testimony of defendant's involvement with the witness and in the crime. This evidence included the fact that defendant had been found in possession of the walkie-talkie radio and gun which had been used in the commission of the crime and two other accomplices had freely testified with regard to defendant's involvement in the crime. On the basis of these facts, the Second Circuit found the inferences which could be drawn from the questions which the prosecutor asked and which the witness refused to answer as merely cumulative of other, more important evidence.

The case before us is quite different. There was here no independent evidence placing defendant in the house at the time of the burglary. There was evidence placing Arias there and it was central to the State's case to prove that defendant had been in the house with Arias. The television set and stand taken from the scene of the crime and found in defendant's possession could have been taken by defendant at the time of the burglary; however, it was quite possible, as defendant testified, that he bought those items from Arias after the burglary and with knowledge that they were stolen. This might make him guilty of theft by receiving stolen property (A.R.S. § 13-1802(A)(5)) but would not make him guilty of the burglary or kidnapping—both of which were completed acts—or of first degree murder. *See* A.R.S. §§ 13-1902(A); 13-1507; 13-1105.

No witness testified to direct knowledge of defendant's presence in the house and participation in the burglary, robbery or the actual killing. Two cellmates testified to statements which defendant allegedly made. Some of these statements were exculpatory and some inculpatory. Both of these cellmates were thoroughly impeached as convicted felons, witnesses who had colluded on their testimony and who had received consideration from the State for testifying. One of them was further impeached by showing that this was not the first case in which he had made statements to authorities in return for reduced jail time. The jury may or may not have believed these jailhouse confessions were true. Certainly the inferences which could have been drawn from the questions asked Arias helped to strengthen the portion of the cellmates' testimony in which they related inculpatory statements allegedly made by defendant. These witnesses also related statements by which defendant supposedly threatened Arias because Arias had confessed and implicated defendant. The inferences from Arias' refusal to answer the prosecutor's questions corroborated the existence of the Arias confession and its allegations against defendant.

7. *See also United States v. Brown*, 699 F.2d 585, 592–93 n. 6 (2d Cir.1983) (stressing the importance of the fact that the witness in *Rado* was available to the defense for cross-examination).

More important, the State called Rene Nunez, a friend of defendant. Nunez testified to statements which defendant had made before arrest. The State claims that Nunez' testimony provides direct evidence of defendant's complicity with Arias, thus making the inferences from Arias' refusal to answer merely cumulative. We disagree. Nunez' testimony is not unfavorable to Corrales. Nunez stated that Corrales had two conversations with him. The import of those conversations was that Corrales told him that he had nothing to do with the killing of the victim. He had gone riding with Arias earlier in the day on which the crime was committed. They had stopped at the victim's home. Arias had previously worked at that house, as had Corrales. Corrales told Nunez that he remained in the truck while Arias went to the house. When Arias came out, Corrales learned that Arias had kicked in the door and entered the house. Arias brought out a TV, a large mirror and other property. Defendant told Nunez that he had realized they were stolen and at first refused to have anything to do with the property, but then was "conned" because Arias called him "chicken" and, therefore, helped Arias load the stolen items on Arias' truck. Nunez further testified that defendant then stated that he had bought the TV from Arias, knowing that it was stolen. He maintained, however, that "he did not take part in the burglary, he was sitting outside" in the truck. "He told me that Luis had gained entrance into this certain area and that material was pulled out and he [defendant] helped load it up into the car."

Thus, even if the jury had believed every word of Nunez' testimony, that evidence would not necessarily have proved the fact to be inferred from the questions propounded to Arias, which implied that defendant was culpably "involved" in either the "burglary" or the "homicide death." Nothing in defendant's alleged confession to Nunez indicated that he and Arias had planned to burglarize the home, that he had entered the home, that he had known that Arias was going to enter, nor that he had participated in the killing or even had

knowledge of it until the day after. The statement, then, proved only that defendant became aware that Arias committed a burglary and finally and reluctantly was persuaded to help load the property on Arias' vehicle. We must certainly acknowledge that if the jury did believe defendant's statements to Nunez reflected the true facts, they might have been quite reluctant to find defendant guilty of any crime except theft.

Under the circumstances of this case, the critical issue for the State to prove was that defendant had acted together with Arias, either as a principal or accomplice, in the commission of the burglary or the ensuing robbery, and was thus guilty of the murder. In the absence of direct evidence of defendant's presence in the house, the State had only the possession of the television set, a circumstance which plausibly could be attributed to defendant's claim of purchase, and the two sets of statements, one made to the cellmates and the other made to Nunez. Which set of statements was true? The jailhouse statements were internally conflicting and the proponents of that evidence severely impeached. Nunez, though impeached with the prior conviction of a felony, told an internally consistent story and on the record was certainly as credible as the cellmates, if not much more so. The State did its best to corroborate the jailhouse statements and the accomplice theory. It produced evidence of defendant's long friendship with Arias. It produced evidence that Arias had made a statement which implicated defendant and which had caused defendant to threaten to kill Arias. On final argument, it vigorously advanced the position that defendant had been Arias' accomplice. It submitted and obtained an instruction on the accomplice theory. To strengthen the accomplice theory, the prosecution called Arias to the stand and asked a series of questions which not only hypothesized Arias' guilt, but also assumed defendant's involvement with Arias. It continued to propound the damaging questions knowing that Arias would refuse to answer and that it would not be possible

**594**

to cross-examine him on the inferences which could be drawn from the questions.

■ A helpful analysis of the factors to be considered in determining the critical weight issue is set forth in *United States v. Fletcher*, 332 F.2d at 726. We have previously discussed the *Fletcher* factors with approval. *State v. Skinner*, 110 Ariz. at 146, 515 P.2d at 891. Factors which may be considered on the "critical weight" issue include:

(1) the government knew the witness would invoke the privilege;

(2) the questions propounded depicted the alleged offense in its entirety;

(3) the testimony sought was a principal source of support for the government's case;

(4) the witness's refusal to testify was not a mere incident in the course of his other testimony;

(5) the witness's refusal to testify was not an isolated incident in an otherwise complex trial but was, rather, a major feature;

(6) the court did not meaningfully instruct the jury to disregard any inferences from the invocation of the privilege.

■ All of the factors exist in this case and are patent on the record. The only arguable factor is the second. Admittedly the questions did not depict the alleged offense in its entirety, but they did depict all that the State needed in order to convict Corrales. The rest was provided by the felony murder rule and the accomplice instruction. On this record, we conclude that the questions to Arias were central to the State's case, that the questions were of a nature which could have caused the jury to draw adverse inferences from the witness' refusal to answer, that those inferences may well have been a crucial link, permitting the jury to find the jailhouse confessions credible. We find that the inferences

from Arias' refusal to answer therefore added "critical weight" to the State's case in a form not subject to cross-examination. *Namet v. United States, supra; Fletcher v. United States, supra; Commonwealth v. Cook*, 380 Mass. 314, 403 N.E.2d 363 (1980); Annot., 19 A.L.R. 4th 368, 381–85 (1983). They therefore violated defendant's sixth amendment right to confrontation of witnesses. *Douglas v. Alabama, supra.*[8]

We hold, therefore, that continuing to question the witness after his unequivocal, firm invocation of the testimonial privilege had made it clear that he would not answer questions, coupled with the phrasing of the subsequent questions, violated both aspects of the *Namet* rule.

### FUNDAMENTAL ERROR

■ Trial counsel for defendant offered no objection to the State calling Luis Arias or to the questioning of the witness. On appeal, however, defendant argues that the error was fundamental and deprived him of his constitutional right to a fair trial. Ordinarily, the "failure to object to evidence, testimony or arguments waives these matters on appeal." *State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). Where, however, the error goes to the foundation of the case or is "of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial," *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977), the defendant's failure to object does not waive his rights on appeal. *State v. Mincey*, 130 Ariz. 389, 397, 636 P.2d 637, 645 (1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982). "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976). The error in this case was constitutional and went to the defend-

---

8. Since *Douglas* does not discuss the question of whether a confrontation problem exists by reason of inability to cross-examine where, although a question is propounded, the witness makes no answer, we do not address this issue.

*Douglas*, the only Supreme Court case to consider the confrontation issue in this context, holds that the right of confrontation is violated by this type of procedure, and we follow its teaching.

ant's .very right to a fair trial. Thus, it must be considered even though no objection was made at trial.

■ The State argues, however, that the defendant is precluded from raising this issue on appeal because his counsel affirmatively waived his right by failing to object as part of a deliberate trial strategy. It is well established that a defendant may be bound by his counsel's trial strategy decision to waive even constitutional rights. *Estelle v. Williams*, 425 U.S. at 508 n. 3, 96 S.Ct. at 1695 n. 3, 48 L.Ed.2d 126; *State v. Collins*, 133 Ariz. 20, 23, 648 P.2d 135, 138 (App.1982). Implicit in these cases, however, is the requirement that counsel made a deliberate choice to waive known and understood rights. *See Henry v. Mississippi*, 379 U.S. 443, 451–52, 85 S.Ct. 564, 569, 13 L.Ed.2d 408 (1965); *Pulakis v. State*, 476 P.2d 474, 480 (Alaska 1970).

■ We do not believe the evidence in this case supports a finding of waiver. At the Rule 32 hearing, defendant's trial counsel testified that he did not object to the State calling Arias because he wanted the jury to see Arias in person in order to make it easier for them to place the blame on Arias rather than on the defendant. Thus, it appears that the attorney made a deliberate choice not to object to the calling of the witness. However, the error here was not the calling of the witness; it lay in the continued questioning of that witness after he had clearly invoked the privilege and in the phrasing of the questions then propounded.

Defendant's trial counsel testified that the prosecutor's continued questioning of Arias was not consistent with his defense strategy. When asked why he did not object to the questions or ask for a mistrial or cautionary instruction, he replied that it "did not enter my mind." Clearly there was no deliberate choice on the part of defendant's counsel to waive a known and understood right to preclude the prosecution from building its case on impermissible inferences. We find, therefore, that the defendant is not precluded from raising the *Namet* error on appeal.

## HARMLESS ERROR

■ Whether we view the error as one of prosecutorial misconduct, raising the question of fair trial and due process of law or as a violation of the sixth amendment right to confrontation, we must inquire whether the error was harmless. By its very nature, fundamental error is usually not "harmless." Of course, it is possible that even a fundamental violation of defendant's rights would have little impact on the jury. The test is whether we can say the impact of the evidence on the jury was so slight that, without the error, it is clear beyond a reasonable doubt the jury would have returned the verdict of guilty. *State v. Hensley*, 137 Ariz. 80, 669 P.2d 58, 66 (1983); *United States v. Hastings*, — U.S. —, —, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983).

■ The arguments advanced by the State on this point are those already discussed in the portion of this opinion dealing with the issue of "critical weight." Our discussion on that issue indicates the prejudicial effect of the inferences which could be drawn from the improper questions. We cannot say beyond a reasonable doubt that those inferences did not induce the jury to reject the Nunez statement and believe the jailhouse confessions. The evidence in this case was far from overwhelming with respect to Corrales' complicity. That, no doubt, was the reason behind the prosecutor's conduct. Where the record shows that the prosecutor acted intentionally, we will be reluctant to find harmless error. *State v. Sorrell*, 132 Ariz. 328, 330, 645 P.2d 1242, 1244 (1982). The unfavorable inferences were not merely cumulative of other, admissible testimony; they went directly to the critical issue—and could well have affected the decision of the jury. *Cf.*, *State v. Hensley, supra.* We find, therefore, that the error was not harmless and reversal is required.

## OTHER ISSUES

Since retrial is necessary, other issues which may arise on the second trial must be discussed.

Defendant claims the trial court erred in allowing the cellmates to testify to defendant's alleged statement that since Arias had confessed, implicating him, he was therefore going to kill Arias. Defendant concedes that any admission by Arias would not be hearsay. Rule 801(d)(2), Rules of Evidence, 17A A.R.S. Defendant contends, however, that the portion of the statement pertaining to what Arias said in his confession is hearsay within hearsay and is, therefore, inadmissible under Rule 805. We do not agree. The first part of the statement (defendant's comment to his cellmate that Arias had implicated him and might testify against him) was not offered to prove the truth of the statement and is not hearsay at all. Rule 801(c). Therefore, Rule 805 is inapplicable.

We note, however, that the portion of the comment which alludes to the contents of Arias' confession is highly prejudicial when Arias is not available for cross-examination. *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *State v. Adamson*, 136 Ariz. 250, 665 P.2d 972 (1983). In view of the serious evidentiary and constitutional problems, the trial court might well determine that the probative value of that portion of the statement is far outweighed by the possible prejudice. Under such circumstances, the trial court has discretion to exclude any portion of the statement pertaining to the contents of Arias' confession. See Rule 403, Rules of Evidence, 17A A.R.S.

During the process of selecting the jury, the trial judge advised the panel that even though the case involved the charge of first degree murder, "the court has made a determination that the death penalty does not apply in this case." We note first that that statement is inaccurate. The court does not—and did not in this case—determine that the death penalty was not applicable. Any such determination by the court must abide conviction. The prosecutor had made that determination for strategic or other reasons and wished the jury to be informed of this, probably so that the jurors would not be unduly hesitant about convicting the defendant. While we can understand why the prosecutor would wish to proceed in such a manner, we have recently indicated that because punishment is no longer a jury question in first degree murder cases, such instructions should no longer be given. *State v. Koch*, 138 Ariz. 99, 105–06 673 P.2d 297, 303–04 (1983). Since we are reversing on other grounds, we need not consider whether the instruction was reversible error in this case.

Defendant claims that the court erred in admitting certain photographs which defendant claims were prejudicial. We have recently commented upon this type of problem in *State v. Chapple*, 135 Ariz. 281, 287–90, 660 P.2d 1208, 1214–17 (1983). We assume consideration will be given to the principles set forth in *Chapple* when this case is retried.

Finally, defendant claims that he was prejudiced by the ineffective assistance of trial counsel. That issue is moot in light of our disposition.

The judgment of the trial court is reversed and the case remanded for a new trial.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.