NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

OSCAR RICHARD TORRES, *Appellant*.

No. 1 CA-CR 17-0424
FILED 6-19-2018

Appeal from the Superior Court in Maricopa County
No.  CR2015-144313-001
The Honorable Michael W. Kemp, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

Law Offices of Michael P. Denea PLC, Phoenix
By Michael P. Denea, Aaron J. Moskowitz
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge James P. Beene joined.

---

**C A M P B E L L**, Judge:

¶1       Oscar Richard Torres appeals his convictions and sentences for burglary in the first degree, armed robbery, aggravated assault, disorderly conduct, and kidnapping. For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND[1]

¶2       On the evening of September 19, 2015, R.A. and J.V. (jointly, "Victims") sat in R.A.'s fenced backyard, drinking and socializing. Shortly before 9:00 p.m., Torres and two other men entered the yard, uninvited, through a back gate. Brandishing guns, the three trespassers ordered Victims into the house. Rather than comply, R.A. urged J.V. to run, hoping he would be able to contact the police. Frightened, J.V. escaped over the fence and hid in a neighbor's yard. The gunmen forced R.A. into the house and hit him after R.A. denied having any drugs, money, or any other valuables in the house.

¶3       As R.A. dripped blood, the gunmen escorted him through the house into a back bedroom. At that point, believing the gunmen had left and concerned for his friends' welfare, J.V. returned. The gunmen forced both Victims to the bedroom floor, threatening to kill them. The gunmen again demanded money, drugs, and anything else of value, which R.A. denied having.  One of the intruders hit him again with a gun.

¶4       Torres then held Victims at gunpoint while the other intruders searched the house for valuables. When those gunmen opened another bedroom door, however, and discovered a woman in the house, they "freaked out" and ran from the home. Once Torres realized his accomplices had fled, he also left.

¶5       Unarmed, Victims followed Torres and spotted him a short distance away, walking down the street away from the house while holding

---

[1]      We view the facts in the light most favorable to sustaining the verdicts. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

a shotgun. When Torres realized Victims were pursuing him, he turned and fired a shot that hit the pavement and debris struck R.A.'s right leg. J.V. grabbed Torres by the neck and Victims eventually pushed Torres to the ground. Ultimately Torres was disarmed and J.V. held him at gunpoint until police officers arrived.

¶6         The State charged Torres with one count of burglary in the first degree (Count 1), two counts of armed robbery (Counts 2 and 3), three counts of aggravated assault, (Counts 4, 5, and 6), one count of disorderly conduct (Count 7), two counts of kidnapping (Counts 8 and 9), and one count of misconduct involving weapons (Count 10).[2] The State also alleged numerous aggravating circumstances and that Torres had a prior felony conviction.

¶7         At trial, defense counsel theorized that Victims fabricated a home invasion to obfuscate their own criminal wrongdoing. Indeed, defense counsel argued Victims assaulted Torres, without provocation, as he walked by R.A.'s home on the evening in question, and then staged a home invasion to prevent a police investigation into their illegal drug operations.

¶8         After an eight-day trial, a jury found Torres guilty as charged and found multiple aggravating circumstances for each count. Torres pled guilty to misconduct involving weapons and the superior court sentenced him to concurrent, maximum sentences for Counts 1 through 9 and a concurrent, presumptive sentence for Count 10, totaling 28 years' imprisonment.   17-0424

## DISCUSSION

¶9         As his sole issue on appeal, Torres contends the superior court improperly permitted the State to call J.V. to testify. Specifically, Torres argues that J.V.'s invocation of the Fifth Amendment and refusal to answer questions, after he provided testimony inculpating Torres, deprived Torres of his constitutional right to confront witnesses against him and present a complete defense.

¶10        More than a year before trial, defense counsel moved for the appointment of counsel for J.V. As part of that motion, defense counsel explained that police officers had found several items that did not belong to J.V. during their investigation, suggesting, "[a]t the very least," that J.V. had taken another person's identity. Without any objection from the State,

_____

[2]        The count of misconduct involving weapons was severed for trial.

the court appointed counsel for J.V. Shortly thereafter, defense counsel notified the court that J.V.'s immigration status may be relevant to his credibility and motive in the case.

¶11 Less than a week before trial, the State moved in limine to preclude any evidence that "the victims [were] not legal citizens and therefore ha[d] a motive to lie." Acknowledging that "it appears accurate the victims [were] undocumented aliens," the State nonetheless argued that their immigration status was irrelevant to the charges.

¶12 Before voir dire commenced on the first day of trial, the superior court asked whether defense counsel objected to the State's motion in limine. Defense counsel stated he had no objection insofar as the prosecutor avowed that no benefit of any kind had been conferred on Victims. Assuaging defense counsel's concerns, the prosecutor avowed that Victims had not received any benefit or special status. Based on these assurances, the superior court granted the State's motion in limine.

¶13 On the third day of trial, the prosecutor disclosed to defense counsel that J.V. had reported that he had entered the United States for the first time immediately before the charged offenses occurred. Defense counsel filed a notice of intent to cross-examine J.V. regarding his immigration status. Defense counsel argued the evidence was "classic" impeachment material.

¶14 Before J.V. testified, his court-appointed attorney told the court that he had advised J.V. to exercise his Fifth Amendment right not to incriminate himself if asked about his entry into the United States or any other questions that may suggest he violated his federal tourist visa. In response, defense counsel argued that he should be permitted to question J.V. regarding the terms of his visa, asserting evidence that J.V. had violated his visa would tend to prove a motive "to fabricate his version of events" against Torres. In the event J.V. invoked the Fifth Amendment in response to such questioning, defense counsel asked the court to strike "his entire testimony" because such an invocation would deprive Torres of his constitutional right to confront his accusers. The court advised defense counsel that his cross-examination of J.V. regarding any possible visa violation would be unrestricted, but declined defense counsel's invitation to strike J.V.'s testimony in its entirety if he invoked the Fifth Amendment, characterizing such a ruling as premature, stating "we're just going to have to see where the questioning goes." After J.V.'s appointed attorney inquired whether the State would be willing to extend use immunity to J.V., the

prosecutor answered that he would grant "use immunity as . . . to any false reporting to law enforcement."

¶15 Later that day, when J.V. testified on direct examination, he repeatedly invoked the Fifth Amendment when asked: (1) whether he was involved in drug trafficking, (2) whether he hid drugs in R.A.'s home the night of the offense, and (3) whether he was refusing to answer questions out of concern he may face negative "immigration consequences." J.V. likewise repeatedly invoked the Fifth Amendment on cross-examination in response to questions regarding: (1) how many times he had entered the United States, (2) if he cleaned the house after the gunmen had left, (3) a shrine in R.A.'s home that depicts a saint to whom drug traffickers frequently direct their prayers, (4) his failure to answer police when questioned regarding the name of an associate, (5) his immigration status, (6) restrictions on his federal tourist visa, (7) whether he violated the visa's terms, and (8) whether he lied to the State when he claimed he had never been to R.A.'s home before the night in question.

¶16 The following day, without explanation, defense counsel withdrew his motion to strike J.V.'s testimony. Before closing argument, the superior court revisited the issue to ensure the record "clearly" reflected defense counsel's intent, directly asking defense counsel whether he wished J.V.'s testimony stricken. Explaining he had withdrawn his motion to strike as a "strategic decision," defense counsel confirmed that he was no longer moving to strike J.V.'s testimony.

¶17 During closing argument, defense counsel did not suggest that the jury should draw an adverse inference from J.V.'s invocation of the Fifth Amendment, but he did contend that J.V.: (1) was not credible, and (2) had fabricated the home invasion because he was trafficking drugs and was unlawfully in the country. In rebuttal, the prosecutor argued there was no evidence that Victims were drug-traffickers, but further asserted that even "drug traffickers" and "illegal immigrants . . . deserve justice."

¶18 We generally review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006). In this case, however, Torres did not move to preclude J.V.'s testimony and expressly withdrew his motion to strike J.V.'s testimony in the superior court. We therefore review his claim that the court should have sua sponte precluded or stricken J.V.'s testimony only for fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 19-20 (2005). Error is fundamental when it affects the foundation of the case, deprives the defendant a right essential to his defense, or is of such magnitude that the

defendant could not possibly have received a fair trial. *Id*. at ¶ 19 (citation omitted).

**¶19**       The Sixth Amendment affords an accused the right to confront and cross-examine the witnesses against him. *State v. Dunlap*, 125 Ariz. 104, 105 (1980). Although this right is fundamental, witnesses have a corresponding right to invoke the Fifth Amendment privilege against self-incrimination. *State v. Robison*, 125 Ariz. 107, 109 (1980). In cases in which these constitutional rights conflict, both "must be respected." *Id*.

**¶20**       The superior court has discretion to permit counsel to call a witness who has avowed that he or she will refuse to testify. *State v. Corrales*, 138 Ariz. 583, 588 (1983). In exercising this discretion, the court "must determine whether the interest of the person calling the witness outweighs the possible prejudice resulting from the inferences the jury may draw from the witness' exercise of the privilege." *Id*. When the scope of the prospective invocation is unknown, and "it is possible" that the witness will answer some questions, "testing of the privilege may properly be done before the jury." *Id*.

**¶21**       Under such circumstances, the court must determine whether the witness's refusal to answer some questions impinges upon the defendant's confrontation right, such that the witness's testimony should be stricken. *Robison*, 125 Ariz. at 109-10. The relevant question is whether the witness's invocation deprives the defendant of his ability to "test the truth of the direct testimony" and defend against the charge. *See id.*

**¶22**       Applying this framework to these facts, the superior court did not abuse its discretion by failing to sua sponte preclude or strike J.V.'s testimony. Before the State called J.V. to the stand, his appointed counsel notified the court that he had advised J.V. to invoke the privilege in response to certain inquiries, but the scope of the prospective invocation was not yet known. Therefore, the court acted well within its discretion by allowing J.V. to testify, but also clarifying that defense counsel could cross-examine J.V. without restriction. Because "jurors tend to view a witness' invocation of the privilege as a 'clear confession of crime,'" *Corrales*, 138 Ariz. at 590 (internal quotation omitted), J.V.'s exercise of the privilege in response to pointed questions regarding his immigration status and involvement in drug trafficking likely undermined his credibility. Not surprisingly, after J.V. testified in full, defense counsel, as a matter of strategy, elected to withdraw his motion to strike J.V.'s testimony. Had the superior court nonetheless stricken J.V.'s testimony, it would have infringed on Torres' ability to present his defense. Given the facts in this

case, in which Torres did not simply stand silent in the face of J.V.'s testimony but instead unambiguously withdrew his motion to strike the testimony as a strategic decision calculated to further his interests and defense, the court's failure to sua sponte strike J.V.'s testimony did not constitute error, much less fundamental, prejudicial error.

## CONCLUSION

¶23 For the foregoing reasons, we affirm the convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED: AA